*In re* K.G. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellant, v. Kimberly M. and Darien G., Sr., Respondents-Appellees (K.G. *et al.*, Minors, Respondents-Appellants)).

First District (4th Division)   No. 1—96—2115

Opinion filed May 22, 1997.

Patrick T. Murphy and Paul Beard, both of Cook County Public Guardian's Office, of Chicago, for appellants K.G. and D.G.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Nancy L. Grauer, Assistant State's Attorneys, of counsel), for the People.

Nathan P. Eimer and Kathleen M. Mulligan, both of Sidley & Austin, of Chicago, for appellee Kimberly M.

Rita A. Fry, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellee Darien G.

PRESIDING JUSTICE WOLFSON delivered the opinion of the court:

The decision of the trial judge in this case is one of the most arduous and troubling decisions any judge can reach.

The State's Attorney filed a petition alleging two children had been neglected and abused by their mother. The petition asked the judge in the child protection division of the Cook County circuit court to declare the children wards of the court. After hearing evidence and arguments, the trial court dismissed the petition, finding no evidence the children were neglected or abused. The Cook County public guardian and the State's Attorney appeal the trial court's decision.

The only issue on appeal is whether the trial court's decision is against the manifest weight of the evidence. We conclude it is not.

FACTS

Sometime before 1994, the Department of Children and Family Services (DCFS) had its first contact with Kimberly M. DCFS received a report that Kimberly was not providing adequate supervision for her children, Darien G. (D.G.) (born April 6, 1984) and Kaniesha G. (K.G.) (born August 3, 1988). Though this report was founded, there apparently was no further intervention until Kimberly's third child, Christine M., was born on June 28, 1994. At that time DCFS received a report that the newborn Christine M. had tested positive for exposure to cocaine.

Though Christine was born a drug-exposed infant, DCFS did not file petitions for the adjudication of wardship in the interest of Christine or her brother (D.G.) and sister (K.G.) alleging that they were abused or neglected as a result of Kimberly's use of drugs. However, Tarsha McCormick, a social worker with a private agency, Chicago Commons, became involved with Kimberly and her children.

McCormick received the referral to work with Kimberly in October 1994. Her first visit with Kimberly was on October 31, 1994, at Kimberly's home. Kimberly and her three children lived with Kimberly's mother, uncle, sister, and her sister's three children. When taking a social history from Kimberly, McCormick learned that Kimberly was using cocaine two to three times per week. Kimberly said she took drugs when she was alone and when she was with others. Her drug usage, she said, was in response to depression and stress.

The service plan that McCormick developed for Kimberly was

based on her admitted drug usage. It required (1) bimonthly urine drops, (2) in-patient drug treatment if her urine tested positive for cocaine, and (3) regular medical checkups for Christine.

McCormick was aware that Kimberly had no crib for Christine. Kimberly was sleeping with Christine on a couch. McCormick requested monetary assistance from her agency to assist Kimberly in the purchase of a crib for Christine. A grant of $60 was approved. McCormick took Kimberly to obtain the check and to shop for a crib. None was purchased at that time, however, because they could not find a crib for $60.

Although the service plan was drawn up in December 1994, the first urine drop was not obtained until March 1995. McCormick apparently attempted one home visit in January, but no one was home. This first urine drop tested positive for cocaine. For this reason, the new (April) service plan set a goal of having Kimberly enroll in a drug treatment program. Referrals were made, but Kimberly did not enroll because the program was not covered by her insurance.

At the April home visit, when the new service plan was developed with Kimberly, McCormick asked Kimberly if she was pregnant. Kimberly said "she hoped she wasn't." McCormick made no other home visits between April and July because she was receiving training during this period. Other workers handled her cases. Someone apparently saw Kimberly in May because a urine drop was obtained on May 15, 1995. This urine drop was negative.

Kimberly gave birth to another cocaine-exposed infant, Derrick G., on July 12, 1995. DCFS received a report and was aware that this was Kimberly's second incident of a drug-exposed birth. Still, no efforts were made to remove the children and no petitions for adjudication of wardship were filed. The DCFS investigator assigned to the case recommended that Kimberly receive in-patient drug treatment.

Kimberly refused to attend an in-patient program because she was unable to find someone to care for her children while she was away. Instead, she enrolled in an intensive 28-day, out-patient program, "BRASS," in August 1995. She completed this program satisfactorily, and the next two urine drops, taken on October 5, 1995, and January 1, 1996, were negative.

McCormick found that the children were generally neat, clean, and appropriately dressed. In fact, McCormick said that in November 1995 Chicago Commons was considering closing Kimberly's case.

On December 26, 1995, however, a tragedy occurred. Five-month-old Derrick G. died of asphyxiation. In the investigation following Derrick's death, Kimberly explained that on December 25, 1995, she went to sleep on the couch with Derrick lying on her chest and

Christine at the foot of the couch. Kimberly admitted that she drank two "shots" of eggnog with brandy in it sometime during the evening of December 25, 1995. The next morning, when Kimberly woke up, she realized that Derrick was not breathing. His body had slipped down between her and the couch, underneath her arm.

Kimberly ran to her uncle's room for help. Her uncle called 911 for an ambulance, while her mother tried to perform CPR on Derrick. When the ambulance arrived, Derrick was taken to Wyler hospital, where he was declared dead on arrival.

Following Derrick's death, petitions for the adjudication of wardship were filed on January 5, 1996, in the interest of Kimberly's three remaining children.

K.G. and D.G. were alleged to be neglected due to injurious environment (705 ILCS 405/2—3(1)(c) (West 1994)) and abused due to substantial risk of physical injury (705 ILCS 405/2—3(2)(ii) (West 1994)). The basis for these allegations was:

"Mother delivered two of her children that tested positive for substance abuse at birth. Mother currently has a death case pending. On 12/26/95 minor's sibling died while in the care and custody of the mother."

The petition on Christine M. alleged that she was neglected because, as a newborn infant, her blood had tested positive for the presence of cocaine.

The State asked for temporary custody of the children, stating that "the severity of injury or seriousness of the allegations makes it too risky to leave the minor(s) in the home." After a temporary custody hearing, the court removed the children from the home and ordered that Kimberly's visits with the children be supervised until the cause of Derrick's death could be determined.

Subsequently, a trial was held on the petitions for adjudication of wardship. Tarsha McCormick testified at the trial and told about her involvement with the family since October 1994.

Antonio Stone, a DCFS worker assigned to investigate Derrick's death, testified that on December 27, 1996, she spoke with Kimberly, the children, and the baby's father (Derrick G., Sr.). The father had been in Kimberly's home the night of December 25, 1995. The father verified that Kimberly had gone to sleep on the couch with the baby on her chest but noted that Derrick usually slept in a crib. Stone also testified that Darien G. told her that his mother had been drinking beer on December 25, 1995, and was drunk when she fell asleep on the couch with the baby on her chest.

On cross-examination, however, Stone admitted that she checked all of the children for signs of physical abuse and found nothing; that

Darien G. told her he never saw anyone use drugs in his house; and that Derrick G., Sr. (the father), told Stone that, to his knowledge, Kimberly was not using drugs and was taking good care of the children.

Carlos Latimer, a death investigator for the Cook County medical examiner's office, was working on a study on Chicago infant mortality in conjunction with the Loyola Medical University. He testified that he went to Kimberly's home to discuss Derrick's death. Kimberly had been cooperative. She admitted that she had only two prenatal doctor visits before Derrick was born and that she smoked cigarettes, drank, and took cocaine while she was pregnant with him.

Kimberly reenacted her positioning on the couch on the morning she found Derrick not breathing. Using a prop doll as Derrick, Kimberly showed how she found Derrick pressed against her breast under her arm. Latimer took several photographs showing what Kimberly said were her and Derrick's positions on the couch. These photos were admitted into evidence. Latimer testified that he measured the couch and found it to be 157 centimeters by 87 centimeters.

The certified medical examiner's report, which concluded that Derrick G.'s death by asphyxiation had been accidental, was admitted into evidence. In addition, Kimberly presented an expert witness, Dr. Sheldon, the director of sleep disorders at Children's Hospital. Dr. Sheldon concurred with the medical examiner's conclusion that Derrick's death was an accidental asphyxia due to overlay. He testified that "co-sleeping" (defined as two persons sleeping on the same surface) was an acceptable practice that was not inherently dangerous or neglectful. In fact, he claimed that studies indicated that co-sleeping with adults may be beneficial to an infant's sleeping patterns. He concluded that a parent co-sleeping with an infant was not evidence of neglect or abuse and that he, himself, had allowed his own child to sleep on his chest.

Kimberly M. was called as an adverse witness by the State. When asked if she used cocaine, she invoked her fifth amendment right and refused to answer.

The trial court found:

1. There was no credible evidence that Kimberly was still using drugs on the date that Derrick died;

2. The evidence showed that Kimberly did not intentionally cause Derrick's death;

3. There was no evidence that Kimberly failed to exercise the care that circumstances required on December 26, 1995; and

4. Kimberly's failure to purchase a crib due to lack of funds did not establish abuse or neglect.

As to K.G. and D.G., the court found no evidence to support a finding that they were abused or neglected. The petitions for adjudication of wardship regarding K.G. and D.G. were dismissed.

As to Christine M., however, the court found there was no statute of limitations on the filing of a petition for adjudication of wardship under the Juvenile Court Act of 1987 (705 ILCS 405/1—1 *et seq.* (West 1992)) and, based on Christine being born drug-exposed on June 28, 1994, she was a neglected child under the Act.

The office of the Cook County public guardian, representing the minors, K.G. and D.G., appeals the order as it pertains to K.G. and D.G. The order as it pertains to Christine M. is not part of the appeal.

The State's Attorney filed a motion for leave to adopt the brief of the minors. Leave was granted.

Kimberly M., represented by private counsel, filed a brief in response to the public guardian's appeal, asking that this court affirm the trial court's ruling. Derrick G., Sr., represented by the public defender's office, moved to adopt Kimberly's brief. This motion was granted.

The State, through its motion to adopt the public guardian's brief, has seen fit to inform us that new petitions for adjudication of wardship of K.G. and D.G. were filed while this appeal was pending. Our decision in this case is based solely on the record before the trial court when it dismissed the State's petition.

## DECISION

A child, Derrick G., died while in the care of his mother. In addition, he and one of his siblings, Christine M., tested positive for the presence of the illegal substance, cocaine, at birth. We know that the mother, Kimberly M., used cocaine while she was pregnant. The question is whether these facts, which were the only factual allegations in the petitions for adjudication of wardship, provide sufficient evidence to require a finding that Derrick G.'s siblings, K.G. and D.G., were exposed to a substantial risk of physical injury or an injurious environment.

The trial court found that the facts did not prove that Kimberly created "a substantial risk of physical injury to such minor[s] by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function" (705 ILCS 405/2—3(2)(ii) (West 1994)) or that the "environment [was] injurious to [their] welfare" (705 ILCS 405/2—3(1)(b) (West 1994)).

■ We begin by noting that the best interest of the child is the

paramount consideration whenever a petition for adjudication of wardship or any proceeding is brought under the Juvenile Court Act. *In re B.C.*, 262 Ill. App. 3d 906, 635 N.E.2d 570 (1994); *In re B.M.*, 248 Ill. App. 3d 76, 79, 618 N.E.2d 374 (1993). It is the State's burden to prove the neglect or abuse alleged in any wardship petition by a preponderance of the evidence. *In re B.T.*, 204 Ill. App. 3d 277, 280, 561 N.E.2d 1269 (1990). Preponderance of the evidence is that amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not. *In re C.C.*, 224 Ill. App. 3d 207, 586 N.E.2d 498 (1991).

At an adjudicatory hearing the trial court's first responsibility is to determine whether the minor is abused, neglected, or dependent. 705 ILCS 405/2—18(1) (West 1994). The concept of "neglect" is not static. It has no "fixed and measured meaning," but draws its definition from the individual circumstances presented in each case. *In re Stilley*, 66 Ill. 2d 515, 520, 363 N.E.2d 820 (1977); *In re A.D.R.*, 186 Ill. App. 3d 386, 391, 542 N.E.2d 487 (1989). As a general rule, however, it is "the failure to exercise the care that circumstances justly demand and encompasses both wilful and unintentional disregard of parental duty." *In re M.K.*, 271 Ill. App. 3d 820, 826, 649 N.E.2d 74 (1995).

Neglect based on "injurious environment" is an "amorphous concept" not readily susceptible to definition. *In re S.D.*, 220 Ill. App. 3d 498, 502, 581 N.E.2d 158 (1991). Each case must be judged on its own merits, based on the particular circumstances present. *In re Ashley F.*, 265 Ill. App. 3d 419, 638 N.E.2d 368 (1994).

A trial court's determination of a neglect issue is entitled to great deference and will not be disturbed on appeal unless contrary to the manifest weight of the evidence. *In re A.D.W*, 278 Ill. App. 3d 476, 482, 663 N.E.2d 58 (1996). A trial court's finding is against the manifest weight of the evidence if a review of the record clearly demonstrates that the opposite result would be the proper one. *In re T.B.*, 215 Ill. App. 3d 1059, 1062, 574 N.E.2d 893 (1991). After all, "the trial court is in a much better position than is this court to observe the witnesses, assess credibility, and weigh the evidence." *In re T.B.*, 215 Ill. App. 3d at 1062.

Certain circumstances constitute *prima facie* evidence of abuse or neglect. Proof that a minor has a medical diagnosis at birth of withdrawal symptoms from narcotics or barbiturates is *prima facie* evidence of neglect; proof that a parent repeatedly used a drug to the extent that it has or would ordinarily have the effect of producing in the user a substantial state of stupor, unconsciousness, intoxication, hallucination, disorientation, or incompetence, or a substantial

impairment of judgment, or a substantial manifestation of irrationality, shall be *prima facie* evidence of neglect; proof that a parent repeatedly used a controlled substance in the presence of the minor or a sibling of the minor is *prima facie* evidence of neglect; and proof that a newborn infant's blood, urine, or meconium contains any amount of controlled substance, or a metabolite of a controlled substance, is *prima facie* evidence of neglect. 705 ILCS 405/2—18(2)(d), (f), (g), (h) (West 1994).

■ In addition, proof that one minor is abused, neglected, or dependent is admissible evidence on the issue of abuse, neglect, or dependency of any other minor for whom the parent is responsible. *In re David D.*, 202 Ill. App. 3d 1090, 1093, 560 N.E.2d 966 (1990).

A parent's behavior toward one minor may be considered when deciding whether a sibling is exposed to an injurious environment. *In re S.M.*, 171 Ill. App. 3d 361, 366, 525 N.E.2d 565 (1988).

Failure of a parent to protect a child from harm or provide him with a safe and nurturing home "falls within the concept of statutory neglect." *In re M.K.*, 271 Ill. App. 3d 820, 826, 649 N.E.2d 74 (1995).

But even where *prima facie* evidence of abuse or neglect is presented, it creates only a rebuttable presumption that may be overcome by the introduction of other evidence. *In re Edricka C.*, 276 Ill. App. 3d 18, 657 N.E.2d 78 (1995); *In re Simmons*, 127 Ill. App. 3d 943, 469 N.E.2d 215 (1984).

■ In the case before this court, the evidence presented showed that Kimberly M. had been using cocaine on a regular basis, though there was no evidence that she was using drugs in the presence of her children. In fact, Stone testified that D.G. told her that he never saw anyone use drugs at his home.

Clearly, Kimberly had given birth to two children who tested positive for the presence of cocaine. That fact, alone, was *prima facie* evidence that Christine M. and Derrick G. were neglected, and it was admissible evidence to be considered on the issue of the neglect of K.G. and D.G.

The trial court recognized Kimberly's drug use created *prima facie* evidence of neglect. It went on to find the drug-exposed births of Christine M. and Derrick G. were not enough, without more, to create an injurious environment or substantial risk of harm to K.G. or D.G. We note that K.G. was seven years old at the time of the adjudicatory hearing. D.G. was 12.

In addition, according to three urine drops obtained from Kimberly since March 1995, she had stopped using cocaine. She satisfactorily completed a drug treatment program in August 1995, and it appeared that she had maintained a drug-free environment for her children.

We find it significant that no effort ever was made to remove Kimberly's children from her care, due to her drug use, before Derrick's death.

The remaining concern is whether the circumstances surrounding Derrick G.'s death should be deemed abuse, which would establish a *prima facie* case of neglect for his siblings.

■ The Juvenile Court Act defines an abused minor as one whose parent or guardian: (1) inflicts, causes to be inflicted, or allows the infliction of physical injury on the minor by other than accidental means; (2) creates a substantial risk of physical injury to the minor by other than accidental means; and (3) commits or allows to be committed any sex offense against the minor. 705 ILCS 405/2—3(2)(i), (ii), (iii) (West 1994).

■ The evidence presented at the adjudicatory hearing supports a finding that Derrick G. died accidentally, from asphyxia due to overlay. Both the medical examiner and the expert witness said so. There was no evidence presented to dispute Kimberly's claim that Derrick died while they slept together on the couch.

The trial court found that Derrick's death did not result from an act of negligence. It found there was no evidence that Kimberly failed to exercise the degree of care necessary under the circumstances. We cannot say this conclusion was against the manifest weight of the evidence. As noted, both the medical examiner and the expert witness pronounced Derrick's death accidental. The expert testified that co-sleeping was not detrimental and, in some cases, was beneficial to an infant. We do not see any facts that require a conclusion that anything Kimberly did in connection with Derrick's death would create a substantial risk of physical harm to K.G. and D.G.

## CONCLUSION

It is not our role to second-guess the trial judges who see the witnesses and hear the testimony. Our review of the record does not clearly demonstrate that a result opposite to the one reached by the trial court would be the proper one. For that reason, we affirm the trial court's order dismissing the petition for adjudication of wardship.

Affirmed.

McNAMARA and BURKE, JJ., concur.