# Illinois Official Reports

## Appellate Court

---

### *In re Rayshawn H.*, 2014 IL App (1st) 132178

---

| | |
|---|---|
| Appellate Court Caption | *In re* RAYSHAWN H., a Minor, Respondent-Appellee (The People of the State of Illinois, Petitioner-Appellee, v. Melissa W., Respondent-Appellant). |
| District & No. | First District, First Division<br>Docket No. 1-13-2178 |
| Filed | July 7, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's orders finding respondent, an adopted minor, neglected and adjudicating him a ward of the court with a permanency goal of "return home" within five months was upheld on appeal over respondent adoptive mother's contentions that the trial court erred in finding neglect, in failing to find the minor was "dependent" under the Juvenile Court Act through no fault of his mother, and in granting the State's motion *in limine* excluding testimony as to the minor's mental state and behavior, since the findings that respondent was a neglected minor and that the evidence did not support a finding of no-fault dependency were not against the manifest weight of the evidence and the exclusion of evidence concerning the minor's mental state and behavior was not an abuse of discretion; furthermore, respondent mother's challenges to the disposition order were rendered moot by the trial court's modified disposition order finding respondent mother fit, willing, and able to care for the minor and returning him to her care under an order of protection. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-JA-247; the Hon. Bernard J. Sarley, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Law Offices of Kim R. Kardas, of Chicago (Kim Kardas, of counsel), for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Nancy Kisicki, and Nicole Lucero, Assistant State's Attorneys, of counsel), for the People.

Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Jean M. Agathen, of counsel), guardian *ad litem*.

Panel

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Presiding Justice Connors and Justice Hoffman concurred in the judgment and opinion.

**OPINION**

¶ 1     This appeal arises from the April 30, 2013 and May 30, 2013 orders entered by the circuit court of Cook County, which found respondent Rayshawn H. (Rayshawn) neglected, and which adjudged Rayshawn as a ward of the court and set a permanency goal of "return home" within five months of the May 30, 2013 order. On appeal, Rayshawn's mother, respondent Melissa H. (Melissa), argues that: (1) the circuit court erred in finding that Rayshawn was neglected; (2) the circuit court erred in failing to find that Rayshawn was a "dependent" under the Juvenile Court Act of 1987 (705 ILCS 405/2-4(1)(c) (West 2012)) through no fault of Melissa; and (3) the circuit court erred in granting the State's motion *in limine* to exclude certain witness testimony regarding Rayshawn's mental state and behavior. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 2                                   BACKGROUND

¶ 3     In 1996, Rayshawn was born and was later adopted as an infant by Melissa and her husband, Joe H. (Joe). During the fall of 2010, Rayshawn was twice hospitalized for mental health issues. In the spring of 2011, then 14-year-old Rayshawn was hospitalized for a third time for mental health issues. On March 14, 2011, upon discharge from the third hospitalization, Melissa refused to pick Rayshawn up or allow him to return home, and did not make alternative care arrangements for him.[1] As a result, Illinois Department of Children and Family Services (DCFS) took protective custody of Rayshawn.

---

[1]Joe, Rayshawn's adoptive father, died in 2010.

¶ 4        On April 14, 2011, the State filed a "petition for adjudication of wardship" (petition for adjudication), alleging that Rayshawn was abused due to a substantial risk of injury (705 ILCS 405/2-3(2)(ii) (West 2012)), and neglected due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2012)) and lack of necessary care (705 ILCS 405/2-3(1)(a) (West 2012)), on the basis that Melissa refused to allow him to return home upon his release from his third hospitalization and that she failed to create a care plan for him. On that same day, April 14, 2011, the State also filed a motion for temporary custody, requesting that Rayshawn be placed in temporary custody of a legal guardian because probable cause existed that he was neglected. Following a hearing on the motion for temporary custody, the circuit court granted the motion, appointed temporary custody to DCFS, and appointed a public guardian and guardian *ad litem* (GAL) for Rayshawn.

¶ 5        On April 11, 2012, Melissa filed a petition for adjudication, alleging that Rayshawn was a dependent without proper or necessary care through "no fault, neglect, or lack of concern" by her (705 ILCS 405/2-4(1)(c) (West 2012)). In July 2012, Melissa's petition for adjudication was amended to include a statement certifying the truthfulness of the content in the petition.

¶ 6        Prior to the adjudication hearing, the State filed a motion *in limine*, asking the court to exclude evidence, including testimony from Rayshawn's therapists, that pertained to his behavior *after* the State had filed the April 14, 2011 petition for adjudication and he had been placed into the temporary custody of DCFS. The State argued, and the GAL agreed, that such postpetition evidence was irrelevant to the events that led to the lockout of Rayshawn from his home upon discharge from his third hospitalization. Melissa argued that such postpetition evidence was necessary to show that she was not neglectful, that it would show Rayshawn's psychiatric condition prior to DCFS taking temporary custody of him, and that it would show how he should have been placed in a residential treatment facility instead of being released from the third hospitalization and, thus, would support her claim that he was a dependent through "no fault, neglect, or lack of concern" by her (no-fault dependency) under section 2-4(1)(c) of the Juvenile Court Act. On July 26, 2012, the circuit court granted the State's motion *in limine*, finding that the postpetition evidence was not relevant to the issue of Rayshawn's behavior before DCFS took custody of him and was thus irrelevant to the issues at adjudication. The court reasoned that what occurred after the petition for adjudication was filed by the State concerned "behavior that may have been influenced by other factors; and it doesn't necessarily mean that one way or another, the minor's behavior before, necessarily conformed to what the behavior was afterwards." The court then noted that Melissa would be allowed to make an offer of proof concerning the postpetition evidence at the adjudication hearing.

¶ 7        On December 20, 2012, March 18, 2013, and April 4, 2013, an adjudication hearing was held. The State presented the testimony of Sandra Conner-Grand, a DCFS investigator who was assigned to Rayshawn's case on March 15, 2011. Conner-Grand testified that during the investigations, she spoke with Rayshawn at the Streamwood Behavioral Health Center (Streamwood) in order to investigate a claim that his mother refused to pick him up from the facility, a situation known as a "lockout." Rayshawn told Conner-Grand that he wanted to go home and that he had been hospitalized at Streamwood for anger issues which he exhibited at school as a result of being bullied. He told Conner-Grand that Melissa adopted him when he was four months old, that she was the only mother he had ever known, and that he did not

understand why his mother would not want him to return home. Rayshawn also denied that he had ever "been physical" with his mother. On cross-examination, Conner-Grand stated that her conversation with Rayshawn lasted about 10 minutes and that his case was assigned to another DCFS investigator after March 15, 2011. Conner-Grand testified that, prior to speaking with Rayshawn, she did not review any hospital records or speak with any doctors relating to Rayshawn's issues and the reasons behind his hospitalization. She neither reviewed any DCFS reports nor had any information that Melissa had physically abused or failed to provide for Rayshawn. Conner-Grand never spoke with Melissa. She did not observe any physical marks of abuse on Rayshawn and he did not appear malnourished.

¶ 8     The circuit court then admitted into evidence, without objection, three exhibits presented by the State: (1) a 60-page DCFS report detailing the investigations in Rayshawn's case (People's Exhibit 1); (2) "certified and delegated" records from Metropolitan Family Services, where Rayshawn received counseling from August 2010 to November 2010 (People's Exhibit 2); and (3) Rayshawn's hospital records at Streamwood, where he was treated for mental health issues from February 2011 to March 2011 (People's Exhibit 3). Medical records from Streamwood indicate that Rayshawn was diagnosed with bipolar disorder, psychotic disorder, oppositional defiant disorder, and mental retardation.

¶ 9     The circuit court also admitted into evidence, without objection, exhibits presented by Melissa's attorney: (1) reports from the Ada S. McKinley facility, where Rayshawn received counseling in December 2010 (Respondent's Exhibit 1); and (2) medical records during Rayshawn's hospitalization for psychiatric treatment at Hartgrove Hospital (Hartgrove) in August 2010 and November 2010 (Respondent's Exhibit 3).[2]

¶ 10     Bernard Leverette, a DCFS investigator, testified on behalf of the State that on March 18, 2011, he telephoned Melissa regarding her refusal to pick up Rayshawn upon his discharge from Streamwood. Melissa informed Leverette that she had locked Rayshawn out of their home as a result of his increasingly bad behavior, but that he had not been physically aggressive toward her. Leverette testified that, on April 7, 2011, he had another telephone conversation with Melissa during which he discussed efforts to return Rayshawn home, and informed her of DCFS support services that were available to her. Leverette also presented Melissa with the alternative option of finding a relative who could help take care of Rayshawn, to which she said she would try to pursue that option. Attempts to contact Melissa by telephone again late afternoon on April 7, 2011, as well as several times on April 8, 2011, April 11, 2011 and April 12, 2011, were unsuccessful. Leverette testified that, on April 12, 2011, he also visited Melissa's home but she was not home. He testified that, on April 13, 2011, he spoke with Melissa by telephone, and Melissa informed him that she had been out of town for a family emergency. During the April 13, 2011 conversation, Melissa stated that she would not allow Rayshawn to return home at that time and that she was unable to find a family member who would be able to care for Rayshawn. When Leverette reminded Melissa that she still had a legal responsibility for Rayshawn, Melissa did not say anything. The next day, April 14, 2011, Leverette had another telephone conversation with Melissa, who again informed him that Rayshawn could not return home at that time and that there was no one else to take care of him.

---

[2]Respondent's Exhibit 2 was withdrawn as a duplicate of People's Exhibit 2.

¶ 11    On cross-examination by the assistant public guardian, Leverette testified that, during the April 7, 2011 and April 13, 2011 telephone conversations, despite offering DCFS' services to Melissa, she informed Leverette that Rayshawn was not allowed to return home. Leverette testified that, upon Rayshawn's release from Streamwood in March 2011, he was placed in a 21-day emergency shelter operated by Universal Family Connection. At the expiration of Rayshawn's 21-day stay at the emergency shelter, Leverette informed Melissa during their April 7, 2011 conversation that Rayshawn needed to be removed from the shelter and returned home. On cross-examination by Melissa's attorney, Leverette stated that Melissa informed him during the telephone conversations that Rayshawn "needed more than what she could provide for him," that she had a declining ability to control her son's outbursts, attitude and defiance, but that Leverette did not ask Melissa about the specifics of what she meant. Melissa informed him that she had moved her granddaughter, Crystal, and Crystal's three-year-old son Michael, out of her home as a result of an incident where Rayshawn allegedly fondled Michael. Leverette further testified that he had handled over 100 investigations during his 19-year tenure with DCFS. He stated that, in cases involving mental health issues of a minor, it was the responsibility of the treating mental health hospitals, not DCFS investigators, to make decisions as to whether the minor should return home or be placed in a residential treatment facility, and that DCFS investigators are required to follow the recommendations of the treating mental health hospitals.

¶ 12    On redirect examination, Leverette stated that he was assigned to investigate Rayshawn's case on March 18, 2011, at which time Rayshawn was ready to be discharged from Streamwood, where he was treated for mental health issues. At the time of the March 18, 2011 telephone conversation with Melissa, Crystal and Michael had already moved out of Melissa's home. Melissa never informed Leverette that she wished to engage in the services offered by DCFS. Melissa told Leverette that none of her relatives were available to care for Rayshawn, and she did not provide him with any names of relatives to investigate. On recross by Melissa's attorney, Leverette testified that at no point did Melissa say she *never* wanted Rayshawn to return home.

¶ 13    Following Leverette's testimony, the State and the assistant public guardian rested, and the circuit court denied Melissa's motion for a directed finding.

¶ 14    Melissa testified for the defense that she was 59 years old and had previously worked as a certified nursing assistant with children involved in DCFS. She and her husband, Joe, who is now deceased, adopted Rayshawn when he was three months old. During infancy, Rayshawn was diagnosed as "mentally and physically delayed," and, as a result, Melissa enrolled him at Woodlawn Intervention Program (Woodlawn), where he was evaluated for his physical and mental capabilities. At Woodlawn's suggestion, Melissa subsequently enrolled Rayshawn in physical therapy and Foster Park Developmental School (Foster Park). After enrolling at Foster Park for a year, Rayshawn enrolled in Paul Cauffe School, a Chicago public school, where he remained through spring 2010 and fall 2011. In spring 2010, school officials notified Melissa that Rayshawn was becoming disruptive in class and that he was making threats at school. On April 9, 2010, Joe, Rayshawn's adoptive father, died. Thereafter, teachers and counselors informed Melissa that Rayshawn was failing all of his classes, and he subsequently did not graduate from the eighth grade. During that time, Rayshawn also

became disruptive at home and Melissa observed him physically hit her granddaughter,[3] Crystal, during a fight. Melissa explained that Crystal and Crystal's son Michael were then living in her home. Michael, who was then three years old, later told Melissa that Rayshawn had allegedly touched his genitals, after which Melissa called the police and DCFS. Although the police came to Melissa's home, DCFS did not. During fall 2010, Rayshawn, who was close to 6 feet tall and weighed over 200 pounds, became "aggressive" with Melissa. When asked to describe what she meant by "aggressive," Melissa stated that Rayshawn would "get loud" in speaking to her and would move toward her from a distance of six to eight feet away, to a distance of three to four feet from her, and that she felt fear because she did not know what he would do. However, she noted that Rayshawn had never physically hit her. During fall 2010, Rayshawn was setting fires to the house, cutting the wires to the home's alarm system, continuing to act out in school, and starting to run away from home at night. Melissa testified that she called the police and reported that Rayshawn would run away to the house of a man who was a minister and that the minister had molested him. In fall 2010, Rayshawn was hospitalized for the first time for psychiatric treatment at Hartgrove. Rayshawn also engaged in outpatient counseling and, during conversations that Melissa had with the therapist and Rayshawn, Rayshawn admitted that he had set small fires in the home, which created burn marks on the ceiling and countertops, and that he had cut the wires to the home's alarm system. In November 2010, Rayshawn was hospitalized for a second time at Hartgrove, after he chased a neighbor with a knife in hand, brought a knife to school, and became a threat to himself. Upon his release from Hartgrove for the second time, Rayshawn received outpatient counseling at facilities such as Metropolitan Family Services and Ada S. McKinley. In February 2011, shortly after Rayshawn returned to school, Melissa was called to the school regarding an incident involving him. The school principal, counselor, and other staff members met with Melissa and, during the meeting, Rayshawn "was laying on the floor, rolling around, screaming and hollering." After the meeting, Rayshawn was admitted to Streamwood, where he underwent psychiatric treatment. Melissa testified that she did not pick Rayshawn up from Streamwood when he was ready for discharge because she no longer believed outpatient programs could help him, and believed that he would not receive the proper help he needed by coming home and being exposed to the same environment. She informed Leverette that Rayshawn needed to be placed in a residential treatment facility for Rayshawn's safety and the safety of others. She denied ever telling DCFS or anyone that she did not want Rayshawn. She admitted that she was never out of town for a family emergency during the time that Leverette contacted her about returning Rayshawn home upon release from Streamwood.

¶ 15   Defense then presented an offer of proof as a result of the court's July 26, 2012 granting of the State's motion *in limine*, which sought to exclude evidence pertaining to Rayshawn's behavior after the State had filed the April 14, 2011 petition for adjudication and he had been placed into temporary DCFS custody. Counsel for Melissa stated that, had the court allowed it, Melissa would have continued to testify that Rayshawn had since admitted to fondling Michael and that he himself had been sexually molested by the minister. She would have identified a letter written by Rayshawn as part of his therapy sessions, in which he detailed

---

[3]Crystal is Melissa's biological granddaughter and became her adopted daughter after Crystal's biological mother died.

the sexual abuse. Counsel for Melissa argued that this evidence would have confirmed Melissa's suspicions that Rayshawn had been victimized by the minister and that Rayshawn had fondled Michael. Counsel for Melissa stated that he would also have called Crystal, who could have testified about Rayshawn's molestation of her son, Michael. Counsel for Melissa stated that, if called to testify, Joseph Madden and Candice Williams of Onarga Academy, a residential treatment facility where Rayshawn was then currently placed, would corroborate Melissa's opinion that Rayshawn was in need of inpatient residential treatment.

¶ 16 The circuit court then denied the defense's offer of proof for the purposes of adjudication, upholding its previous ruling that postpetition evidence was irrelevant to the issues presented for adjudication. The defense then rested. In rebuttal, the State presented, and the circuit court admitted without any objections, "certified and delegated" records from Universal Family Connection (People's Exhibit 8), which had provided services to Rayshawn between September 2010 and April 2011. The State highlighted for the court the March 9, 2011 and March 14, 2011 entries in the Universal Family Connection records. The March 9, 2011 entry stated that Melissa had advised Universal Family Connection that she would be picking Rayshawn up that day from Streamwood. The March 14, 2011 entry, however, stated that a crisis worker from Bridge Youth Family Services informed a Universal Family Connection worker that Melissa refused to pick Rayshawn up from Streamwood, that Rayshawn was upset his mother did not return his calls, and that he was ready to go home.

¶ 17 On April 30, 2013, the circuit court entered an adjudication order, finding that the State had proven by a preponderance of the evidence that Rayshawn was a neglected minor due to lack of necessary care and due to an injurious environment. However, the circuit court found that the evidence did not sustain the State's allegations of "abuse due to a substantial risk of injury," and that the evidence did not support a finding of no-fault dependency as alleged in Melissa's petition for adjudication.

¶ 18 On May 30, 2013, following a disposition hearing, the circuit court found that it was in Rayshawn's best interest to be adjudged a ward of the court and to be placed in the guardianship of DCFS. The circuit court found that Melissa was unable to care for Rayshawn, but allowed her unsupervised visits at the discretion of DCFS or a private agency. The circuit court then entered a permanency order of "return home within 5 months."

¶ 19 On June 28, 2013, Melissa filed a timely notice of appeal.

¶ 20                                                          ANALYSIS

¶ 21 We determine the following issues: (1) whether the circuit court erred in finding that Rayshawn was a neglected minor; (2) whether the circuit court erred in failing to make a finding of no-fault dependency; and (3) whether the circuit court erred in granting the State's motion *in limine* to exclude certain postpetition evidence regarding Rayshawn's mental state and behavior.

¶ 22 We first determine whether the circuit court erred in finding that the preponderance of the evidence proved that Rayshawn was a neglected minor due to lack of necessary care and due to an injurious environment. On review, we will not reverse the circuit court's determinations unless they are against the manifest weight of the evidence. See *In re Christopher S.*, 364 Ill. App. 3d 76, 86 (2006). "A circuit court's finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident from the record." *Id.*

¶ 23    Section 2-3(1)(a) of the Juvenile Court Act of 1987 (the Act) defines a neglected minor to include one "who is not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being, or other care necessary for his or her well-being, including adequate food, clothing and shelter." 705 ILCS 405/2-3(1)(a) (West 2012). Additionally, under section 2-3(1)(b) of the Act, minors are neglected if their "environment is injurious to [their] welfare." 705 ILCS 405/2-3(1)(b) (West 2012). In contrast, under section 2-4(1)(c) of the Act, a "dependent minor" is one "who is without proper medical or other remedial care recognized under State law or other care necessary for his or her well being through no fault, neglect or lack of concern by his parents, guardian or custodian." 705 ILCS 405/2-4(1)(c) (West 2012).

¶ 24    In the case at bar, the circuit court determined that Rayshawn was neglected, but found that the evidence did not support a finding of no-fault dependency as alleged by Melissa. "Neglect" is generally defined as:

> "the failure to exercise the care that circumstances justly demand and includes both willful and unintentional disregard of parental duties. [Citation.] The term is not a 'fixed and measured meaning' and it takes its content from specific circumstances of each case. [Citation.] Accordingly, cases involving an adjudication of neglect and wardship are *sui generis*, and each case must be decided on the basis of its own unique circumstances. [Citation.]" *In re Christopher S.*, 364 Ill. App. 3d at 88.

The focus of our inquiry is whether the minor is neglected, not whether the parents are neglectful. See *In re Arthur H.*, 212 Ill. 2d 441, 467 (2004). The State has the burden to prove the allegations by a preponderance of the evidence. *In re Christopher S.*, 364 Ill. App. 3d at 86. In the instant case, the State alleged in its petition for adjudication that Rayshawn was neglected in two ways–that is, that he lacked necessary care and was subject to an injurious environment. The circuit court adjudged that Rayshawn was neglected in both ways. In its ruling, the circuit court found that Rayshawn did not present any real danger to Melissa, that Melissa did not make any alternative efforts or a care plan for him, that Melissa declined services offered by DCFS, and that Rayshawn was "locked out" and not permitted to return home upon his discharge from hospitalization at Streamwood.

¶ 25    Melissa argues that evidence presented at the adjudication hearing was insufficient to prove that Rayshawn was neglected. Specifically, she contends that, in light of Rayshawn's increasingly violent and disruptive behavior over the years, as well as the numerous times that she sought help for her son, the State failed to prove by a preponderance of the evidence that Rayshawn was a neglected minor.

¶ 26    The State counters that the circuit court's finding that Rayshawn was neglected was not against the manifest weight of the evidence. The State argues that a review of Rayshawn's medical records and DCFS records shows that he was not physically aggressive against Melissa, that Melissa never tried to find alternative placements as to where he could live, nor did she create any care plans for him. Specifically, the State contends that nothing in the record supports Melissa's contentions that she was fully attentive to Rayshawn's medical needs, or that she was willing to help him, once he was released from Streamwood.

¶ 27    The public guardian argues that the circuit court's adjudicatory findings of neglect were supported by the evidence, where Melissa refused to allow Rayshawn to return home upon his release from Streamwood; Streamwood records show that Rayshawn was "doing well" by

the date of discharge; Crystal and Michael had moved out of Melissa's home by the time Rayshawn was discharged from Streamwood; and Rayshawn never presented any danger to Melissa in March and April 2011. Further, the public guardian maintains that Melissa failed to create an alternative care plan for Rayshawn, that she demonstrated a lack of concern for her son and was not interested in participating in DCFS services, and that Melissa made no concrete steps to provide Rayshawn food, shelter, or clothing in March and April 2011.[4]

¶ 28    In support of her arguments, Melissa directs our attention to *In re Christopher S.*, 364 Ill. App. 3d 76, and *In re S.W.*, 342 Ill. App. 3d 445 (2003). We find these cases to be distinguishable from the case at hand. In *In re Christopher S.*, the State filed a petition for adjudication of wardship when it became aware that the minor had been "locked out" as a result of his adoptive parents' refusal to pick him up or to allow him to return home following his discharge from a psychiatric hospital. *In re Christopher S.*, 364 Ill. App. 3d at 79. The parents informed a DCFS investigator that the minor was out of control and had "threatened violence against the family." *Id.* Upon being informed that his parents did not want him to come home, the minor stated that he did not want to live with them. *Id.* The parents attempted to make alternative arrangements for the minor to live at Mercy Home, and stated that they were willing to pay for his lodging there. *Id.* However, Mercy Home denied admission to the minor. *Id.* The parents eventually arranged for the minor to live with his biological aunt on a short-term basis. *Id.* At the adjudication hearing, extensive testimony was presented about the minor's long-standing behavioral problems, aggression, violence, and suspected larceny and other criminal acts. *Id.* at 79-81. The parents, with no success, attempted a number of alternative housing arrangements and therapies for the minor, including military school and psychiatric hospitalization. *Id.* at 80-82. After the lockout, the parents continued to be actively involved in locating treatment for the minor, including attempted placements in 43 separate residential treatment facilities. *Id.* at 83. Due to the minor's behavioral and criminal problems, no treatment center would admit him. *Id.* Moreover, because the minor was not a ward of the State, he was not eligible for some treatment options. *Id.* Although the guardian *ad litem* argued for a finding of neglect due to lack of necessary care, the circuit court found that the minor was dependent through no fault of the parents. *Id.* at 84. On appeal, in affirming the circuit court's finding of no-fault dependency, this court found:

> "[T]he evidence is clear that [the parents] did not neglect [the minor]. The guardian *ad litem* would have this court find that [the parents] neglected [the minor] because they could not accomplish an impossible task, which was to force [the minor] to partake in the process of returning home against his will. The guardian *ad litem*'s argument defies logic, common sense, and most importantly the law. The cases upon which the guardian *ad litem* relies are distinguishable as [the parents] in this case only refused to take [the minor] home after a violent incident ensued, causing [the] mother to fear for her safety and that of her family. Caring for [the] family's safety, which also included [the minor's] own safety, showed great parental concern for [the

---

[4]The State and the public guardian do not challenge the circuit court's finding that the evidence did not sustain the allegations of "abuse due to a substantial risk of injury" and, thus, we need not address the issue on appeal.

minor's] well-being, not neglect. Furthermore, [the parents] made every effort to arrange an alternative care they could afford." *Id.* at 88-89.

¶ 29    Unlike *In re Christopher S.*, in the instant case, the record shows that, in March 2011, Melissa refused to allow Rayshawn to return home upon his discharge from Streamwood and that she made little to no effort in finding alternative living arrangements for Rayshawn. While she informed Leverette during the April 7, 2011 telephone conversation that she would try to find a relative to care for Rayshawn, Leverette was unable to reach her by telephone over the next several days. It was not until April 13, 2011 that Leverette was finally able to reach Melissa by telephone and it was then that Melissa informed Leverette of her inability to find a family member who would be able to care for Rayshawn. However, Melissa did not recommend any names of relatives to Leverette for further investigation, nor did she indicate what attempts she made to locate a relative to care for Rayshawn. Indeed, a DCFS report presented at the adjudication hearing stated that Melissa "has consistently refused or failed to make a plan subsequent to *** Rayshawn's release from Streamwood." Further, unlike *In re Christopher S.*–in which the minor exhibited physically violent behavior toward his mother such as throwing a telephone at her, screaming and yelling at her, cornering her and punching a hole in the wall next to her–Rayshawn here did not exhibit such physically aggressive behavior toward Melissa, did not harm her, and did not present any real danger to her. While evidence was presented to the court that Rayshawn had physically hit Crystal and had allegedly fondled Michael, it is undisputed that Crystal and Michael had moved out of Melissa's home months before Rayshawn was discharged from Streamwood. Moreover, unlike the parents in *In re Christopher S.*, who were actively involved in the minor's care and treatment, Leverette's testimony revealed that Melissa showed no interest in engaging in support services offered by DCFS but refused to allow Rayshawn to return home.

¶ 30    Likewise, we find Melissa's second cited case, *In re S.W.*, to be distinguishable from the case at bar. *In re S.W.* involved a lockout situation following the minor's hospitalization, and the evidence presented at the adjudication hearing demonstrated that the minor had an extensive history of psychological problems, physical aggression and violence, had tried to kill her mother, and was "out of control." *In re S.W.*, 342 Ill. App. 3d at 447-50. The circuit court entered a finding of no-fault dependency under the Act, which this court upheld on appeal. *Id.* at 450, 453. Unlike *S.W.*, in which there was no evidence that the minor's mother failed to arrange alternative care or treatment for the minor following the lockout, there is ample evidence in the instant case that Melissa did not make sufficient efforts to find Rayshawn necessary care–such as providing appropriate shelter.

¶ 31    We further note that, aside from factual distinctions, an important procedural difference exists between the case at bar and the cases cited by Melissa. In both *In re Christopher S.* and *In re S.W.*, the circuit court entered findings of no-fault dependency, which were affirmed on appeal. In contrast, in the case at bar, the circuit court entered a finding of neglect. As discussed, we review the circuit court's findings at an adjudication hearing only to determine whether they are against the manifest weight of the evidence. See *In re Christopher S.*, 364 Ill. App. 3d at 86. In order to reverse the circuit court's findings under this standard of review, the opposite conclusion must be "clearly evident from the record." *Id.* Rather, we find the facts in the case at bar to be more akin to those in *In re Diamond M.*, 2011 IL App (1st) 111184 (affirming circuit court's finding of neglect, rather than no-fault dependency, where mother refused to allow psychologically troubled minor to return home following

hospitalization, but failed to make sufficient efforts to find alternative living arrangements for minor, failed to cooperate with minor's care providers, and showed lack of concern for minor's welfare), *In re L.H.*, 384 Ill. App. 3d 836 (2008) (affirming circuit court's finding of neglect, where mother locked minor out of home following hospitalization for psychiatric treatment, refused to provide alternative placement for minor, refused to cooperate with DCFS in developing a care plan for minor, and refused to consider minor's return to her home and, thus, mother was responsible for placing minor in her current position), and *In re Christina M.*, 333 Ill. App. 3d 1030 (2002) (upholding court's finding of neglect where mother refused to provide shelter for minor by locking her out of her home against the advice of DCFS investigator, and refused to participate in facilitating a care plan for minor). While Melissa emphasizes numerous actions on her part in caring for, and tending to, Rayshawn's mental and physical needs over the years, nothing in the record supports the contention that she was equally attentive and responsive to his needs once he was discharged from Streamwood. Nor do we find persuasive her arguments that DCFS' alleged failure to assist her in the past with Rayshawn's behavioral problems somehow led her "to reasonably determine that [Rayshawn] needed intensive residential care." We recognize that Rayshawn's behavior, beginning in spring 2010, was indeed difficult and burdensome; however, Melissa's own unilateral assessment that Rayshawn needed inpatient care at a residential treatment facility and her refusal to allow him to return home, without much effort to find alternative care plans for him and without any interest to engage in DCFS services, support the court's findings of neglect. As Leverette testified, in cases involving mental health issues of a minor, it was the responsibility of the treating hospital, not DCFS investigators who must follow the hospital's recommendations, to make decisions as to whether a minor should return home or be placed in a residential treatment facility. Based on the evidence presented at the adjudication hearing, we cannot say that the opposite conclusion is clearly evident. Because we find that the circuit court properly entered a finding of neglect, we reject Melissa's arguments, which rely on the same facts of record, that the circuit court should have entered a finding of no-fault dependency under section 2-4(1)(c) of the Act. The evidence does not support Melissa's contentions that she was not responsible for placing Rayshawn in the current position. See *In re Christina M.*, 333 Ill. App. 3d at 1035 (evidence supports classifying minor as neglected and not dependent because respondent was responsible for placing the minor in her current position). Therefore, we hold that the trial court's findings that Rayshawn was a neglected minor, and that the evidence did not support a finding of no-fault dependency, were not against the manifest weight of the evidence.

¶ 32    We next determine whether the circuit court erred in granting the State's motion *in limine* to exclude certain postpetition evidence regarding Rayshawn's mental state and behavior, which we review under an abuse of discretion standard. See *In re Kenneth D.*, 364 Ill. App. 3d 797, 803 (2006); see 705 ILCS 405/2-18(1) (West 2012) (the rules of evidence in the nature of civil proceedings are applicable to adjudicatory hearings under the Act). All evidence must be relevant to be admissible. *In re Kenneth D.*, 364 Ill. App. 3d at 803. Evidence is relevant if it tends to prove a fact in controversy or render a matter in issue more or less probable. *Id.*

¶ 33    As discussed, prior to the adjudication hearing, the State filed a motion *in limine*, asking the court to exclude evidence, including testimony from Rayshawn's therapists and personnel at his then current residential placement. Those individuals became acquainted with him *after*

- 11 -

the State had filed the April 14, 2011 petition for adjudication and he had been placed into temporary DCFS custody. Specifically, in her answer to interrogatories, Melissa listed, *inter alia*, therapist Bryan Brown,[5] as well as Madden and Williams, as potential witnesses at the adjudication hearing. The State argued that testimony from Brown or any other personnel from Rayshawn's then current residential treatment facility, who only became familiar with Rayshawn's family after he was taken into DCFS custody, was irrelevant postpetition evidence. In opposing the motion *in limine*, Melissa argued that such postpetition evidence was necessary to show that she was not neglectful; that it would show Rayshawn's psychiatric condition prior to being taken into temporary custody by DCFS; and that it would show how he should have been placed in a residential treatment facility instead of being released from Streamwood and, thus, would support her claim that he was a dependent under the Act through no fault of hers. Following a hearing, the circuit court granted the motion *in limine*, finding that the postpetition evidence was not relevant to the issue of Rayshawn's behavior before DCFS took custody of him and was thus irrelevant to the issues at adjudication. The court reasoned that what occurred after the petition for adjudication was filed by the State concerned "behavior that may have been influenced by other factors; and it doesn't necessarily mean that one way or another, the minor's behavior before, necessarily conformed to what the behavior was afterwards." At the adjudication hearing, Melissa made an offer of proof regarding Madden's and Williams' proposed testimony to corroborate Melissa's opinion that Rayshawn was in need of inpatient residential treatment, as well as Crystal's and Melissa's proposed testimony that Rayshawn had fondled Michael and that Rayshawn had been sexually molested by the minister. However, Melissa does not make an offer of proof concerning Brown. The circuit court then denied the defense's offer of proof for the purposes of adjudication, upholding its previous ruling that postpetition evidence was irrelevant to the issues presented for adjudication.

¶ 34     On appeal, Melissa argues that the circuit court erred in excluding the postpetition evidence, claiming that "the opinions of experts, therapists and other personnel that became familiar with [Rayshawn's] case after the petition was filed are relevant and should not be disregarded as postpetition evidence because the expert opinions are based upon [Rayshawn's] mental health medical records that were from [his] three hospitalizations prior to the petition." Melissa contends that such evidence was relevant, and thus admissible, because it directly related to the issue of whether Rayshawn should have been discharged from Streamwood in the first place.

¶ 35     We find that the circuit court did not abuse its discretion in excluding the evidence in question. First, we note that Melissa's failure to make an offer of proof at the adjudication hearing regarding Brown's proposed testimony, rendered this issue forfeited on appeal with regard to Brown. See *In re Kamesha J.*, 364 Ill. App. 3d 785, 792 (2006) (to preserve an error in the exclusion of evidence, the proponent of the evidence must make an adequate offer of proof in the trial court; the purpose of an offer of proof is to enable a reviewing court to determine whether the exclusion of the evidence was proper; failure to make such an offer of proof results in forfeiture of the issue on appeal). Second, we find *In re Kenneth D.* instructive. In *In re Kenneth D.*, the circuit court found the minor abused and neglected due to his mother's drug use. *In re Kenneth D.*, 364 Ill. App. 3d at 799. On appeal, this court

_____
[5]Bryan Brown's name varies throughout the record and in the parties' briefs on appeal.

affirmed the circuit court's findings and addressed the mother's claim that the court erroneously excluded evidence at the adjudication hearing of her compliance with services after the minor was taken into protective custody by DCFS. *Id.* at 803. This court, finding *In re S.W.*, 342 Ill. App. 3d 445, instructive, held that the mother's completion of services after DCFS' removal of the minor was not relevant to the allegations in the petition–namely, whether at the time the minor was taken into protective custody, the mother had a drug problem that made the minor's environment injurious and created a substantial risk of physical injury to him. *In re Kenneth D.*, 364 Ill. App. 3d at 804. Rather, this court found, the mother's subsequent conduct was properly admitted at the disposition hearing instead. *Id.*

¶ 36     In *In re S.W.*, the facts of which were summarized above, the circuit court addressed the mother's argument that her participation in services after the removal of her child should have been considered at an adjudicatory hearing where the State alleged the child was dependent due to the mother's inability to care for the child. *In re S.W.*, 342 Ill. App. 3d at 451. This court rejected the mother's claim, finding that the mother "seems to confuse the adjudicatory hearing and the dispositional hearing." *Id.* In making its finding, the court relied upon our supreme court's decision in *In re C.W.*, 199 Ill. 2d 198, 217 (2002), which stated that evidence of a parent's improved conduct following removal of the child "does not somehow absolve or erase the parent's initial failing that triggered the State intervention and removal of the child." Although the *In re S.W.* court recognized that *In re C.W.* dealt with a termination of parental rights and not an adjudication hearing involving the abuse and neglect of a child, by analogy it found that the mother's subsequently completed services and subsequent behavior were not the proper subject at an adjudication hearing. *In re S.W.*, 342 Ill. App. 3d at 451.

¶ 37     Applying the principles of *In re Kenneth D.*, *In re S.W.*, and *In re C.W.* to the instant case, we find that the postpetition evidence was irrelevant to the allegations of the petition for adjudication and thus, was properly excluded as evidence at the adjudication hearing. First, we note that Rayshawn's medical records from Streamwood, as well as those from his two hospitalizations at Hartgrove, *were* admitted into evidence at the adjudication hearing. Second, we find that postpetition evidence that Rayshawn admitted to fondling Michael and that he had been sexually molested by the minister, may have provided one possible explanation for Rayshawn's troubled behavior, but bore no relevance as to whether Melissa sought alternative placement or a care plan for Rayshawn at the time she refused to allow him to return home. Even if postpetition evidence was introduced to corroborate Melissa's opinion that Rayshawn needed inpatient residential treatment at the time he was discharged from Streamwood, this did not absolve her failure to secure alternative care arrangements for Rayshawn following the lockout, her failure to remain in contact with Leverette to create a care plan, and failure to show any interest to participate in DCFS support services that Leverette repeatedly offered her.

¶ 38     Melissa relies on *In re Edricka C.*, 276 Ill. App. 3d 18 (1995), in support of her argument that the postpetition evidence was relevant to the allegations of neglect, abuse, and no-fault dependency. She argues that the exclusion of such evidence ran afoul of the prohibition against creating a bright-line rule that all postpetition evidence is irrelevant. In *In re Edricka C.*, the reviewing court concluded that the circuit court had erroneously established a "bright-line rule" that all postpetition evidence was irrelevant to the adjudicatory hearing. The reviewing court found that it was error for the circuit court to exclude evidence that after

the petition was filed, the child tested negative for an alleged blood disorder because this evidence was indeed relevant to disprove the allegation that the child was medically neglected. *In re Edricka C.*, 276 Ill. App. 3d at 31. We agree with the general proposition of law in *In re Edricka C.* that there is no "bright-line post-petition test for admissibility of evidence." See *id.* at 32. Rather, the test for admissibility of postpetition evidence depends on whether it is relevant to the allegations in the petition for adjudication. However, as discussed, the excluded evidence in the case at bar bore no relevance to the determination of whether Melissa provided appropriate shelter, alternative placement, and a care plan for Rayshawn, at the time of his discharge from Streamwood. Further, the exclusion of the postpetition evidence did not deprive Melissa of due process, contrary to the cursory argument which she makes for the first time in her reply brief. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) (an appellant forfeits points not raised in her initial brief and cannot argue them for the first time in the reply brief; a party forfeits legal arguments that are not well-developed); *Bartlow v. Costigan*, 2014 IL 115152, ¶ 52 (an issue that is merely listed or included in a vague allegation of error is not "argued" and does not satisfy Rule 341(h)). Thus, we cannot conclude that no reasonable person would take the view adopted by the circuit court. Therefore, we hold that the circuit court did not abuse its discretion in granting the State's motion *in limine* to exclude the postpetition evidence in question.

¶ 39   Next, we note that, although Melissa's notice of appeal refers to the circuit court's May 30, 2011 disposition order in which the circuit court found that Melissa was unable to care for Rayshawn and adjudged him a ward of the court under the guardianship of DCFS, in her opening brief, Melissa makes no arguments relating to the disposition ruling. Instead, in her reply brief, Melissa contends that the disposition order was not supported by the evidence and that she had not forfeited review of this issue on appeal. Because Melissa expressly challenges the disposition ruling for the first time in her reply brief, she has forfeited this issue for review on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) (an appellant forfeits points not raised in her initial brief and cannot argue them for the first time in the reply brief). Forfeiture aside, we note that, on January 22, 2014, the public guardian filed a status report before this court, which stated that the circuit court had entered a January 21, 2014 modified disposition order finding Melissa fit, willing and able to care for Rayshawn and had returned Rayshawn to Melissa's care under an order of protection. Thus, we find any challenges to the May 30, 2011 disposition order to be moot, and we need not address this issue further. See *In re Christopher K.*, 217 Ill. 2d 348, 358-59 (2005) (an issue on appeal becomes moot where events occurring after the filing of the appeal render it impossible for the reviewing court to grant effectual relief to the complaining party); *Condon v. American Telephone & Telegraph Co.*, 136 Ill. 2d 95, 99 (1990) (reviewing courts will not decide moot or abstract questions, will not review cases merely to establish precedent, and will not render advisory opinions).

¶ 40   For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 41   Affirmed.