*In re* EDRICKA C. *et al.*, Minors. (The People of the State of Illinois, Petitioner-Appellee, v. Zina C., Respondent-Appellant).

First District (6th Division)   No. 1—94—2545

* Opinion filed October 27, 1995.

Helen L. Thornton, Benjamin C. Weinberg, and Diane L. Redleaf, all of Legal Assistance Foundation of Chicago, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Gunta Z. Hadac, Assistant State's Attorneys, of counsel), for the People.

Patrick T. Murphy, Public Guardian, of Chicago (Lee Ann Lowder and Susan S. Wigoda, of counsel), guardian *ad litem*.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Following an adjudicatory hearing, the circuit court of Cook County entered an order finding that respondent, Zina C., had neglected her minor children, Edricka C. and Zemaj C., by exposing them to an injurious environment and substantial risk of physical injury. The trial court based its findings on a theory of anticipatory neglect. There was no direct evidence that respondent had abused or neglected Edricka and Zemaj. Based on previous findings, however, that respondent had beaten an older child in 1987 and left her other children unsupervised in 1989, the trial court held that Zemaj, born in 1991, and Edricka, born in 1992, lacked proper care. The issue on review is whether the trial court properly found that Edricka and Zemaj are neglected based on prior neglect findings concerning the older siblings. We reverse.

The record reveals the following facts. On December 2, 1992, the Department of Children and Family Services (DCFS) filed two petitions for adjudication of wardship. One petition alleged that Edricka C., born on June 13, 1992, "is neglected in that the minor's parent *** does not provide the proper or necessary *** medical or other remedial care recognized under the state law." The second petition alleged that Zemaj C., born on May 27, 1991, "is abused in that the minor's parent *** creates a substantial risk of physical injury to such minor." These petitions were based on a report that respondent had failed to bring her daughter Edricka for treatment for a blood disorder called galactosemia. As a result, DCFS considered Edricka medically neglected and Zemaj at substantial risk of physical injury.

On February 20, 1993, the juvenile court ordered respondent to have Edricka tested for galactosemia. Respondent took Edricka to her pediatrician, Doctor Francois Conte, who then arranged for the test to be performed at South Shore Hospital. On February 23, 1993, Doctor Conte received the lab results, which showed that Edricka tested negative for the blood disorder.

On August 27, 1993, the State moved to amend the petition regarding Edricka to add an allegation of "abuse/substantial risk of physical injury." The record reveals, however, that the case proceeded to trial without a ruling on this motion.

The trial took place on three dates: October 26, 1993, November 2, 1993, and February 17, 1994. Throughout the trial, the positions of the State and the public guardian were identical. The State's first witness was Elvie Cotton, a DCFS child welfare specialist. Cotton testified that she worked with respondent's family from the fall of 1990 until the summer of 1993. Cotton explained that respondent has

six other children, all older than Edricka and Zemaj. Although she was not the family's caseworker at the time, Cotton stated that DCFS came in contact with the family when the oldest child was severely beaten by her parents in 1987. Cotton also described a second incident in 1989 when a fire broke out in the apartment building where respondent's other five children had been left unsupervised. Cotton was assigned to the case in 1990, and she first met respondent in January 1991.

Cotton testified that from January 1991 until late 1992, she offered respondent marital and parenting counseling, but respondent refused these services. Respondent also failed to follow through on Cotton's recommendations for in-home counseling and psychological evaluations.

On cross-examination, Cotton acknowledged that Edricka had lived with her mother without incident from her birth in June 1992 until the petitions were filed on December 2, 1992. Zemaj, born in May 1991, was also brought into court for the first time in December 1992. Cotton further testified that respondent had completed certain services while living in Minnesota from 1989 to 1990. Cotton stated that the DCFS file contained a certificate of completion from Minnesota verifying that respondent and her husband had attended six counseling sessions concerning domestic violence. Cotton also knew that respondent and her husband had undergone evaluations for chemical abuse in Minnesota and that the assessments indicated that neither parent had a drug or alcohol problem. Cotton then stated that she did not think that Edricka and Zemaj were at any kind of risk of harm from the time of their births until they were first brought into court. She realized that the case concerning Edricka and Zemaj arose from allegations that respondent allegedly did not seek proper medical treatment for Edricka. Finally, Cotton explained that respondent had supervised visits with her oldest daughter and unsupervised visits with her other five children.

When questioned by the guardian, Cotton again testified that she did not bring Edricka and Zemaj into court because she did not think that they were at risk. Cotton also stated that when respondent was pregnant with Edricka, Cotton watched as respondent signed a statement that her husband was not living in her home.

The State next introduced into evidence a certified copy of a battery conviction against respondent and a certified copy of an aggravated battery conviction against respondent's husband. Both convictions arose from the 1987 beating of their oldest child. Over respondent's objections, the court held that the convictions were "admissible on anticipatory neglect theory." The court also admitted

into evidence the medical records from the 1987 incident. The State and the guardian then rested.

Respondent presented her case on the third day of trial, February 17, 1994. She first attempted to offer Doctor Conte's testimony by stipulation. The proposed stipulation contained five paragraphs, with each paragraph describing an occasion when respondent took Edricka to Doctor Conte for treatment. These five visits took place between August 1992 and February 1993. The State and the guardian objected to the last four paragraphs, which concerned visits that took place after December 2, 1992, when the petitions were filed. The State said that it would stipulate to the first paragraph regarding an August 1992 visit if the court found it relevant. The court excluded all five paragraphs.

Later in the trial, respondent's attorney made an offer of proof regarding the proposed stipulated testimony of Doctor Conte. Doctor Conte would have testified that in the five times he saw Edricka over a six-month period, the minor "appeared normal with no signs of abuse or neglect."[1]

Respondent next called Aida Bravo as a witness. Bravo testified that she worked at McKinley Family Services for 15 years. As of the

---

[1]Respondent's offer of proof, as read into the record by her attorney, states the following:

"Doctor Francois Conte, M.D. would testify that on August 19, 1992, Zina [C.] brought her daughter Edricka [C.] to his office for an examination. Doctor Conte examined Edricka and determined she had a mild case of diaper rash, but otherwise appeared normal with no signs of abuse or neglect.

Second, Doctor Conte would testify that on December 4, 1992, Edricka [C.] was examined by Doctor Conte and she received her scheduled immunization shots. Doctor Conte would testify further that the child Edricka [C.] appeared normal with no signs of abuse or neglect.

Doctor Conte would testify that on January 18, 1993 Zina [C.] brought her daughter Edricka [C.] to his office for an examination. Doctor Conte examined Edricka and determined the child had a minor cold, but otherwise appeared normal with no signs of abuse or neglect.

On February 20, 1993, Doctor Francois Conte referred Edricka [C.] to South Shore Hospital for a galactosemia screening. That Edricka [C.] brought her daughter—excuse me. That Zina [C.] brought her daughter Edricka to Doctor Conte's office on February 20, 1993 and requested the galactosemia screen.

That on February 23, 1993, Doctor Francois Conte received the lab results from Smith-Kline Beecham Clinical Laboratories on Edricka

date of trial, Bravo worked as a case aide and as a leader of a parent education group. Bravo stated that respondent came into the agency to request parenting classes around February 1993. Respondent started attending parenting classes at McKinley in March 1993. The State then objected, arguing that the testimony was irrelevant because it dealt with "information after the petitions in this case were filed." The court sustained the objection, and Bravo did not testify to anything further.

Respondent was the next witness to testify. She stated that as she understood the charges against her, the State was accusing her of medically neglecting Edricka. She next discussed the services she sought in Minnesota in 1989. Respondent stated that she received two certificates of completion from the Institute of Black Chemical Abuse (IBCA) in Minnesota for completing domestic violence and chemical dependency counseling sessions.

Respondent then acknowledged the beating of her daughter in 1987. Respondent stated that she "disciplined" her daughter when she was eight or nine because her five-year-old son stated that his sister was sexually fondling him. After the incident, the oldest girl lived with her aunt but the court returned the other children to respondent.

Respondent next answered questions about Edricka and Zemaj. She stated, "I have never neglected Edricka or Zemaj." She testified that Edricka was going to a doctor regularly and "has her shots up to date." She went on to state that both children were in perfect health. When respondent began to describe her visit to South Shore Hospital for Edricka's galactosemia screening, the trial judge sustained an objection to this testimony.

Respondent also briefly mentioned services in which she became involved in Chicago. She stated that she received a parenting certificate from a DCFS program, but she could not remember which program. Respondent also testified that she and her oldest daughter attended counseling about once a week in 1988 or 1989, but that was not a DCFS service.

On cross-examination by the State, respondent admitted that she was not sure how long the counseling courses in Minnesota lasted. She did not have the certificates with her, but she was sure they were in the DCFS files. When asked again about the 1987 incident,

[C.]'s galactosemia screen. That the results of that screen were consistent with normal state non-galactosemia.

That would be the offer of proof regarding Doctor Conte's testimony."

24

respondent admitted that she "disciplined her [daughter] with a belt" and that she "hit her hard." She admitted hitting her "on her legs and buttocks," but could not recall whether she hit her in the face. Respondent then answered multiple questions about the court dates and convictions following this beating. During this questioning, respondent turned to the trial judge and said:

> "Your Honor, can I ask you a question? What does this have to do with me being charged with medical neglect of my daughter? Plus I feel as though this is a double jeopardy. This case has already been heard. Why is it being heard again in this courtroom? What does it have to do with Edricka and Zemaj?"

The trial judge told her that she had plenty of time to discuss these concerns with her attorney and ordered the cross-examination to continue. The State then showed and asked respondent about photographs taken of her oldest daughter after the beating. Respondent also testified that none of her older six children lives with her, but she seemed confused when asked whether this was because of neglect findings. She stated that her mother turned her children over to DCFS when respondent was in Minnesota.

On cross-examination by the guardian, respondent admitted that she left her children unsupervised in 1989, and that this was discovered when a fire broke out in the apartment building. When asked again about the neglect findings for each of the five children left alone, respondent explained, "I have only been found guilty of one child neglect case, and that was when I had a fire, and I came in this courtroom, and I pleaded guilty because I was not at home."

During redirect examination, respondent again acknowledged the 1987 incident with her oldest daughter. She stated that it was "wrong" and that she "went overboard." When asked whether she disciplined any of her other children in that manner, she responded, "No. Never." When asked how she had been dealing with Edricka and Zemaj, she stated:

> "I do not discipline Edricka and Zemaj. I learned that anger comes from the parent. A child cannot make you mad. You get mad at yourself, and that's your own anger and hostility inside you. So a child can't do anything to you. You are an adult. You're supposed to know how to treat a child. So if that means you go take your time out, then that's what you do. Because they are babies, they have to be taught. They don't know."

The defense then rested, and the attorneys made closing arguments.

Basing its ruling on a theory of anticipatory neglect, the court entered findings of "neglect care necessary, environment injurious, and substantial risk of physical injury" for Edricka and Zemaj. The

court explained that even though these minors were originally brought before it on medical neglect allegations, "the court cannot ignore the prior history of this mother and father with their children and dismiss petitions on these two infants."

The court specifically mentioned that respondent's oldest daughter had earlier suffered a severe beating and that there had been neglect findings for the other children left unsupervised. Also, while it found Cotton's credibility "unimpeached," the court described respondent's testimony as "evasive," "argumentative," and disdainful. The court stated that respondent's memory of the services she took part in years earlier was vague, "but more importantly, over the recent year, she has done nothing *** to engage in the services which have been repeatedly offered by Ms. Cotton and other DCFS workers." The trial judge found it "absolutely and abundantly clear that the court need not wait until another child be harmed before the court can act to protect children under the custody of the parents."

On appeal, respondent contends that the trial court applied a sweeping anticipatory neglect theory, ignored and excluded relevant evidence of current care of Edricka and Zemaj, and consequently entered a judgment against the manifest weight of the evidence. Respondent also contends that the trial court abused its discretion in making various evidentiary rulings that excluded as irrelevant any information about her care of the children after the petitions in this case were filed.

■ The Juvenile Court Act of 1987 separately discusses both neglect and abuse. (705 ILCS 405/2—3(1), (2) (West 1992).) A neglected child is one not receiving "the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being." (705 ILCS 405/2—3(1)(a) (West 1992).) A minor "whose environment is injurious to his or her welfare" is neglected. (705 ILCS 405/2—3(1)(b) (West 1992).) "Those who are abused include any minor *** whose parent *** creates a substantial risk of physical injury to such minor by other than accidental means." (705 ILCS 405/2—3(2)(ii) (West 1992).) Under the Juvenile Court Act, "proof of the abuse, neglect or dependency of one minor shall be admissible evidence on the issue of abuse, neglect or dependency of any other minor for whom the respondent is responsible." 705 ILCS 405/2—18(3) (West 1992).

Case law describes neglect generally as the failure to exercise the care that circumstances justly demand. (*In re Ashley F.* (1994), 265 Ill. App. 3d 419, 638 N.E.2d 368.) Cases involving an adjudication of neglect and wardship are *sui generis*, and each case must ultimately be decided on the basis of its own particular facts. (*In re M.B.* (1992), 241 Ill. App.

3d 697, 609 N.E.2d 731.) Neglect encompasses both wilful and unintentional disregard of parental duties. (*Ashley F.*, 265 Ill. App. 3d 419, 638 N.E.2d 368.) Yet, "neglect" and "injurious environment" are not concepts of fixed and measured meanings. (See *In re Walter B.* (1992), 227 Ill. App. 3d 746, 592 N.E.2d 274; *In re B.M.* (1993), 248 Ill. App. 3d 76, 618 N.E.2d 374.) "Because injurious environment is an amorphous concept which cannot be defined with particularity, each case should be reviewed considering the specific circumstances of that case." *B.M.*, 248 Ill. App. 3d at 79, 618 N.E.2d at 376.

At an adjudicatory hearing, the State must prove an allegation of neglect by a preponderance of evidence. (*In re S.D.* (1991), 220 Ill. App. 3d 498, 581 N.E.2d 158.) A determination of neglect by a trial court will not be disturbed absent abuse of discretion. (*In re B.C.* (1994), 262 Ill. App. 3d 906, 635 N.E.2d 570.) Only where there has been abuse of discretion or a judgment is against the manifest weight of the evidence should an adjudication of neglect be disturbed on appeal. *In re F.W.* (1994), 261 Ill. App. 3d 894, 634 N.E.2d 1123.

Edricka and Zemaj were each the subject of a separate petition. Other courts dealing with more than one minor have indicated that since the purpose of the Juvenile Court Act is to secure the care and guidance for "each minor" (705 ILCS 405/1—2(1) (West 1992)), it is important to consider the findings dealing with each child separately. (*In re Brooks* (1978), 63 Ill. App. 3d 328, 379 N.E.2d 872; *M.B.*, 241 Ill. App. 3d 697, 609 N.E.2d 731.) Thus, we will first consider Edricka and then Zemaj.

The petition concerning Edricka alleged medical neglect. Yet, at trial, the State pursued neglect findings on a theory of anticipatory neglect, arguing injurious environment and substantial risk of physical injury. Initially, we would like to note that the State's motion to amend the complaint to add an allegation of "abuse/substantial risk of physical injury" was never ruled upon by the court. At the end of the trial, when this was pointed out to the court, the trial judge stated, "The court is entitled under the Juvenile Court Act to make the findings which are consistent with the evidence in the case whether they are pled as counts by the State or not, and that is what I will do." While this is not abuse of discretion, we disagree with the policy of not ruling on a motion to amend a petition, and then letting the attorneys proceed as if the motion had been granted and the count added. Moreover, section 2—13(5), a recently revised provision of the Juvenile Court Act, contradicts the trial court's statement in that it sets forth clear procedural rules on amending petitions.

Effective September 8, 1994, if a petition for adjudication of a minor has been filed:

"The court shall liberally allow the petitioner to amend the petition to set forth a cause of action or to add, amend, or supplement factual allegations that form the basis for a cause of action up until 14 days before the adjudicatory hearing. The petitioner may amend the petition after that date and prior to the adjudicatory hearing if the court grants leave to amend upon a showing of good cause. The court may allow amendment of the petition to conform with the evidence at any time prior to ruling. In all cases in which the court has granted leave to amend based on new evidence or new allegations, the court shall permit the respondent an adequate opportunity to prepare a defense to the amended petition." 705 ILCS 405/2—13(5) (West 1994).

These requirements were not in effect when the trial court here made its ruling. Also, at oral argument, respondent's attorney stated that it was known early in the trial that the State was now pursuing neglect findings for Edricka based on a theory of anticipatory neglect. Thus, while we are troubled by the fact that the evidence presented at trial by the State had nothing to do with medical neglect and was wholly unrelated to the petition on file, we will now turn to the question of whether the trial court's findings of "neglect care necessary, environment injurious, and substantial risk of physical injury" with regard to Edricka are supported by a preponderance of the evidence.

In its ruling, the trial court focused primarily on respondent's past treatment of Edricka's siblings. The State and the guardian point to a line of cases holding that evidence of abuse of a sibling is sufficient to establish a *prima facie* case of neglect based upon an injurious environment. (*E.g.*, *S.D.*, 220 Ill. App. 3d 498, 581 N.E.2d 158; *In re David D.* (1990), 202 Ill. App. 3d 1090, 560 N.E.2d 966; *In re Harpman* (1986), 146 Ill. App. 3d 504, 496 N.E.2d 1242.) In both *S.D.* and *David D.*, minors who lived in environments where their female siblings were sexually abused were found to be neglected. (*S.D.*, 220 Ill. App. 3d 498, 581 N.E.2d 158; *David D.*, 202 Ill. App. 3d 1090, 560 N.E.2d 966.) In *Harpman*, evidence of a father's sexual abuse of two children from a previous marriage years earlier was admissible on the issue of neglect of three children from the second marriage. Even though the minors in question had not been sexually abused, the *Harpman* court affirmed the trial court's findings of neglect for them. *Harpman*, 146 Ill. App. 3d 504, 496 N.E.2d 1242.

We agree with respondent that the case at hand is distinguishable from the above cases, including *Harpman*, which has the most similar facts. In *S.D.* and *David D.*, the sibling abuse in each case was current, not from years earlier. (*S.D.*, 220 Ill. App. 3d 498, 581 N.E.2d 158; *David D.*, 202 Ill. App. 3d 1090, 560 N.E.2d 966.) In *Harp-*

*man*, the trial court looked at evidence of sibling abuse in the past, but it also heard testimony that the father became sexually aroused when watching the children from the second marriage playing, that he made a suspicious remark about one child's vagina being red, and that he repeatedly denied sexually abusing any of his children. (*Harpman*, 146 Ill. App. 3d 504, 496 N.E.2d 1242.) Here, it is uncontradicted that Edricka and her brother are perfectly healthy, and respondent has not denied either of the two past incidents occurring in 1987 and 1989. We acknowledge that sibling abuse is *prima facie* evidence of neglect. Yet, we find that this presumption is not permanent; it weakens over time, and it can be overcome.

■ The State seems to advocate a *per se* rule of anticipatory neglect which we refuse to adopt. Respondent, on the other hand, persuasively argues that instead of looking solely at past incidents to determine whether Edricka lived in an injurious environment, the court should have also fully considered the child's current care and condition. Any contrary conclusion would cast doubt on the usefulness of all the rehabilitative services offered by DCFS and other programs.

Here, the record reveals that Edricka was never abused or neglected, nor did she ever witness abuse or neglect. Also, Cotton, the family's DCFS worker, testified that she did not feel that Edricka was at any risk during the child's six months at home prior to the filing of the petition. While the trial court placed great emphasis on Cotton's credibility and consistency, it seemed to ignore this statement.

Furthermore, Doctor Conte's proposed stipulated testimony, which the trial court excluded as irrelevant, directly relates to how respondent cared for Edricka. Evidence is relevant if it has any tendency and reason to prove any material fact in issue. (*In re A.T.* (1990), 197 Ill. App. 3d 821, 555 N.E.2d 402.) The first paragraph of Doctor Conte's proposed testimony concerned an August 1992 visit during which the pediatrician saw no signs of abuse or neglect. The State and the guardian said that they would agree to that paragraph if the court found it relevant. That paragraph, however, was excluded by the court. Likewise, when respondent began to testify about how, pursuant to a court order, she took Edricka for a galactosemia test which came back negative, the court excluded that testimony as irrelevant. We find such rulings erroneous and prejudicial to respondent. Even if the State was proceeding on an anticipatory neglect theory, such information is relevant, especially since the only petition on file concerning Edricka alleged medical neglect.

Respondent also questions the court's conclusion that by not taking advantage of the services and counseling available, respondent

has fostered an injurious environment for Edricka. Respondent testified that she had engaged in counseling in Minnesota and in Chicago over the past five years. Cotton corroborated some of this testimony by stating that she knew respondent had become involved in a domestic violence class in Minnesota and that she had the certificate from 1989 in her DCFS file. Cotton also acknowledged that the DCFS file contained drug and alcohol assessments performed in Minnesota in 1989, and that they indicated that respondent and her husband had no problem with chemical dependency.

Although considerable weight is generally given to the judgment of the trial court, which had the opportunity to observe the demeanor and conduct of the witnesses, a trial court's decision must be reversed if it is against the manifest weight of the evidence. (*In re C.B.* (1993), 248 Ill. App. 3d 168, 618 N.E.2d 598.) Here, the trial court found respondent's testimony "evasive" and "argumentative," but found that "Ms. Cotton's credibility is unimpeached" and "abundantly clear." Nevertheless, the court's ruling seemed to ignore any of the favorable information Cotton testified to regarding respondent's efforts. The court understandably showed concern that respondent refused Cotton's counseling and psychological referrals between 1990 and 1992. The court also indicated, however, that respondent did not take advantage of opportunities to visit with her other children. This directly contradicted Cotton, who clearly testified that respondent had unsupervised visits with all but her oldest child, with whom she had supervised visits.

The trial court also stated that "over the recent year, [respondent] has done nothing *** to engage in the services which have been repeatedly offered by Ms. Cotton and other DCFS workers." Yet, while respondent may not have become involved with a DCFS program recently, Bravo, from McKinley Family Services, testified that respondent had begun taking parenting lessons 11 months earlier in March 1993. Bravo did not testify to anything further regarding these classes because the court found such information irrelevant. The court, however, drew a conclusion about the past year that seemed directly contrary to the evidence respondent tried to present through Bravo's testimony.

■ With regard to Edricka, we find that the trial court abused its discretion and made a finding contrary to the manifest weight of the evidence. The State and the guardian have presented evidence of sibling abuse in 1987 and sibling neglect in 1989. Under these circumstances, however, where it is uncontradicted that Edricka has always been in perfect health, respondent has sought and completed counseling services since the neglect findings in 1989, Cotton testified that

the child was not at risk, and Bravo testified that respondent began parenting classes as recently as March 1993, such evidence of past sibling abuse is admissible, but, by itself, insufficient to show that abuse and neglect are imminent for Edricka. Put another way, the record does not reveal that, by a preponderance of the evidence, Edricka lacks care, is exposed to an injurious environment, and is at substantial risk of physical injury.

Turning to Zemaj, we also find that the evidence at trial is insufficient to support the trial court's neglect findings. The petition concerning Zemaj was also filed on December 2, 1992. While Edricka's petition alleged neglect, Zemaj's petition alleged that he was "abused" because respondent put him at "substantial risk for physical injury." The parties seem to agree that the petition for Zemaj originally derived from the petition concerning Edricka. The theory was that because his sister was medically neglected, Zemaj was at risk. Nevertheless, when it became apparent that the medical neglect allegations concerning Edricka were baseless, the State proceeded with the theory that Zemaj was at risk because of his parents' past behavior with his older siblings. Neither of the petitions concerning Edricka and Zemaj alleged neglect by "injurious environment" even though this was one of the findings by the court.

As with Edricka, the State and the guardian seem to advocate that Zemaj is *per se* neglected because of past findings concerning his siblings. The record reveals, however, that Zemaj lived without incident with his mother until he was 19 months old in December 1992. Also, without minimizing the seriousness of these two incidents, Zemaj did not witness the beating of his sister in 1987, nor was he alive when his mother left his siblings unsupervised in 1989.

Respondent testified that, like his sister, Zemaj had his blood drawn regularly and that he was in perfect health. Cotton testified that she did not think that he was at risk when he was living at home with his mother. On cross-examination, Cotton was asked:

> "And in your experience working with DCFS, if you had thought [Edricka and Zemaj] were in any kind of risk of harm during that period from which they were born until February when they actually did get screened into court of '93, you'd have brought that case into court, wouldn't you?"

After the court overruled objections from both the State and the guardian, Cotton answered, "Yes." This testimony flies directly in the face of the State's allegation that Zemaj was at substantial risk of physical harm.

■ We agree with respondent that, with regard to Zemaj, the trial court based its findings too much on speculation. While the Ju-

venile Court Act allows evidence of neglect or abuse of siblings in an adjudicatory hearing, and courts have held that evidence of sibling abuse is *prima facie* evidence of neglect, we find that, here, where two incidents of abuse and neglect occurred years before Zemaj was born, and he has not ever been abused or neglected, the trial court's findings concerning Zemaj come too close to a *per se* rule of anticipatory neglect. Each case concerning the adjudication of minors must be reviewed according to its own facts, and the record here does not support the trial court's determination.

Finally, we would like to address respondent's contention that the trial court made several erroneous evidentiary rulings by excluding any evidence from after the petitions in this case were filed. Respondent argues that the court's exclusion of testimony by respondent, Bravo, and Doctor Conte about events that occurred after the petitions were filed constitutes an independent basis for reversal because these rulings were plainly erroneous and they prejudiced respondent. With regard to Doctor Conte, we have already found prejudicial error in excluding the first paragraph of the pediatrician's testimony. Also, for the reasons stated below, we find that the court erred in preventing respondent and Bravo from testifying about post-petition events. We will not consider the last four paragraphs of Doctor Conte's proposed stipulated testimony, however, because the State and the guardian objected, and disagreement by the parties was an independent basis for the trial court's exclusion of those paragraphs.

Respondent persuasively argues that the court below conducted the trial with a bright-line rule that any post-petition evidence was irrelevant. The petitions were filed on December 2, 1992, and the court repeatedly made comments like: "I certainly don't see what the relevance would be of anything that happened after the day of the petition." The court also sustained several objections made solely on the basis that the testimony concerned "information after the petitions in this case were filed."

Nevertheless, neither the Juvenile Court Act nor any case law mandates that evidence from after a petition for adjudication is filed is irrelevant at the adjudicatory hearing. The Juvenile Court Act states that in all proceedings, "the court may direct the course thereof so as promptly to ascertain the jurisdictional facts and fully to gather information bearing upon the current condition and future welfare of" the minors involved. (705 ILCS 405/1—2(2) (West 1992).) The Act also states that at an adjudicatory hearing, the court shall "first consider only the question whether the minor is abused, neglected or dependent." (705 ILCS 405/2—18(1) (West 1992).) A case proceeding on a theory of anticipatory neglect by its very nature

seems to require considering the present and the future care of the child at the adjudicatory phase. For example, in *In re Brooks*, several witnesses testified at the adjudicatory hearing about how the minors were relating to their parents for months after the original petitions in the case were filed. *Brooks*, 63 Ill. App. 3d 328, 379 N.E.2d 872.

█ Likewise, in the case at hand, respondent's testimony about taking Edricka for a galactosemia screening in February 1993 would certainly have been relevant since the petition alleged medical neglect and it was a court-ordered test that came back negative. Also, allowing Bravo to testify in February 1994 about the services respondent participated in since March 1993 may have directly refuted the conclusion that respondent has made "no effort in the past year" to remediate her situation.

Cutting off such evidence from after the date of the petitions is especially illogical here because the evidence actually presented by the State with regard to Edricka bore no relation to the medical neglect alleged in the petition. Moreover, as stated earlier, the State tried to amend its petition concerning Zemaj in August 1993. If the court would have ruled on and granted this motion, would the cut-off date for evidence have moved from December 1992 to August 1993? Merely posing this question demonstrates the arbitrary unfairness in following a bright-line post-petition test for admissibility of evidence. By excluding as irrelevant a great deal of information solely because it related to events occurring after December 2, 1992, the trial court here prevented respondent from setting forth the defense she chose to present and thereby prejudiced her case.

A trial court's order is subject to reversal on appeal if the trial court exceeded its broad discretion, if its determination results in manifest injustice, or if the order is against the manifest weight of the evidence. (*In re D.L.* (1992), 226 Ill. App. 3d 177, 589 N.E.2d 680.) Here, the manifest weight of the evidence does not support the trial court's findings of neglect concerning Edricka and Zemaj. Also, the trial court abused its discretion in making several erroneous evidentiary rulings that prejudiced respondent. Respondent has also made an argument that her due process rights were violated during the adjudicatory hearing, but because of the conclusions set forth above, there is no need to reach that contention.

Accordingly, the judgment of the circuit court of Cook County is reversed.

Reversed.

EGAN and RAKOWSKI, JJ., concur.