2016 IL App (1st) 152037

SECOND DIVISION
January 26, 2016

No. 15-2037

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| In Re ADAM B., JOSHUA B., and ISAIAH B., Minors, | ) ) ) |
| (The People of the State of Illinois, | ) ) ) Nos. 14 JA 1300 |
| Petitioner-Appellee, | ) 14 JA 1301 |
| | ) 14 JA 1302 |
| v. | ) ) |
| ALMA B., | ) ) Honorable Peter Vilkelis |
| Respondent-Appellant). | ) Judge Presiding |

JUSTICE SIMON delivered the judgment of the court, with opinion.
Justices Neville and Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1     Respondent Alma B. appeals an order of the circuit court of Cook County adjudicating her minor children Adam B., Joshua B., and Isaiah B. abused and neglected. The sole issue on appeal is whether the circuit court's findings of abuse and neglect were against the manifest weight of the evidence. For the following reasons, we affirm the judgment of the circuit court.

¶ 2                                    BACKGROUND

¶ 3     Alma B. is Adam, Joshua, and Isaiah's mother. Marvin C. is Adam's putative father or his father is unknown. Cornell B. is Joshua's father. Antonio S. is Isaiah's putative father or his father is unknown. None of the minors' fathers are parties to this appeal. On November 4, 2014,

the State filed a petition for adjudication of wardship alleging that the minors Adam, born on March 15, 2005, Joshua, born on June 20, 2007, and Isaiah, born on June 9, 2013, were neglected due to a lack of necessary care, neglected due to an injurious environment, and abused due to a substantial risk of physical injury.

¶ 4    In support of its assertions, the State alleged the following facts: (1) Alma B. had four prior indicated reports of inadequate shelter, inadequate supervision, and failure to thrive; (2) an intact case was opened on March 17, 2014; (3) Alma B. was noncompliant with intact services including parenting coaching, therapy, and services for Joshua; (4) Joshua was diagnosed with Oppositional Defiant Disorder (ODD)  and Attention Deficit Hyperactivity Disorder (ADHD) and Alma B. was noncompliant with the mental health treatment for Joshua; (5) Adam was not enrolled in school until October 2014; (6) Alma B. failed to cooperate with her intact worker's attempts to assess the safety of the children in the home since September 16, 2014; (7) on October 28, 2014, Isaiah exhibited an unexplained pattern lesion on his leg and, per medical personnel, the lesion was consistent with a burn; (8) Alma B. admitted a delay in seeking medical attention for Isaiah; (9) Alma B.  had no explanation as to how Isaiah was injured; (10) hospital staff stated that Alma B. was agitated and noncooperative while they were assessing Isaiah's medical needs; (11) Alma B. left the hospital with Isaiah prior to the completion of the medical testing.

¶ 5    On June 8, 2015, the circuit court held an adjudicatory hearing.  Danielle Robinson testified to the following facts.  She was employed as a social worker with Omni Youth Services in the Intact Family Services Unit.  She was assigned to the case involving the minors Adam, Joshua and Isaiah in March 2014, after a hotline call was made due to allegations of physical abuse involving the minors.  The allegations were later determined to be unfounded.  On March

17, 2014, Robinson had an initial meeting at Alma B.'s home located at 1320 South Kedvale Avenue in Chicago. Robinson explained to Alma B. that the services were voluntary. Alma B. signed Illinois Department of Children and Family Services (DCFS) informed consent and permission forms for services. At the initial meeting, Robinson told Alma B. that a consequence for not following up with the voluntary intact family services is that the case could go back to DCFS and may be filed with the circuit court.

¶ 6 Robinson testified that, after assessing Alma B. for services, Omni Youth Services agreed to provide the family with housing assistance, parenting coaching and mental health services for Joshua. Alma B. requested housing assistance because she stated that there were rats in her apartment and she wanted to move out. Robinson contacted a housing advocate to assist Alma B. Robinson testified that Alma B. needed parenting assistance due to Joshua's aggressive behavior at home and at school and because the case came in for suspected physical abuse. Robinson also referred Alma B. to Mary & Tom Leo for parenting coaching. On July 6, 2014, Mary & Tom Leo terminated Alma B. from services because she was noncompliant. The service provider reported that Alma B. had excessive absences and that the decision to remove the services would reduce Alma B.'s stress about participating in the service.

¶ 7 On or about June 4, 2014, Robinson visited the family and learned that Joshua was psychiatrically hospitalized at Garfield Park Hospital. Alma B. told Robinson that, following an assessment conducted by the Screening, Assessment and Supporting Services (SASS) Joshua was hospitalized for behavioral issues. Alma B. told Robinson that Joshua was diagnosed with ODD and ADHD.

¶ 8 Robinson visited the home again on June 23, 2014 at 6 p.m. She learned that Joshua was discharged from Garfield Park Hospital on June 16, 2014. Alma B. told Robinson that Joshua

3

was prescribed 1 milligram of Tenex per day, and that he was adjusting well to his medication. Robinson also learned that Joshua was recommended to participate in in-home therapy as a follow-up to his treatment at Garfield Park Hospital through the Community Counseling Center of Chicago (C4).

¶ 9    Robinson visited the home again on July 22, 2014.  During the visit, Alma B. indicated that Joshua was not seeing a therapist and that the C4 therapist canceled the first session.  Alma B. also stated that Joshua refused take his psychotropic medication and that Alma B. was having a hard time trying to get it.  Robinson advised Alma B. to seek out a psychiatrist for Joshua and to call C4 and request that a different therapist see Joshua.  Alma B. told Robinson that she called SASS when an incident between Joshua and Isaiah took places at a laundromat when Joshua pushed Isaiah's head against a wall.  Alma B. told Robinson that SASS recommended readmission to Garfield Park Hospital and Alma B. agreed.  Robinson offered to drive them to the hospital.  During Robinson's visit, Joshua ran away from the home because he did not want to be readmitted.  Alma B. picked Joshua up and placed him in the car and Robinson drove them to Garfield Park Hospital.  Robinson asked Alma B. to sign a consent to release information for records from Garfield Park Hospital for Joshua and for his discharge papers, but she refused.  On August 5, 2014, Robinson spoke to Alma B. on the phone and Alma B. indicated that Joshua was registered in the Garfield Park Hospital's partial day program on Mondays through Fridays for two weeks to address his ODD and ADHD.

¶ 10    Robinson testified that as an intact worker, to assess a home's safety, she is required to visit a home weekly during the first 45 days and every other week after the first 45 days.  For the first 45 days, Alma B. did not comply with weekly visits, and Robinson had difficulty scheduling visits with Alma B.  Alma B. rescheduled some visits and several visits were canceled.  For the

4

first 45 days of the first 6 weeks, Robinson saw the family four times. Robinson testified that it was difficult to meet Alma B. even at specific dates and times although Alma B. was not working. When the visits decreased to every other week, Alma B. still did not comply and Robinson saw the family monthly.

¶ 11    Robinson testified that on September 16, 2014, she attempted to visit the home. She heard Adam and Joshua inside the house, knocked on the door, but nobody answered. Robinson testified that she did not know if the children were home alone. At that time, Robinson had not seen the family in almost one month. Robinson called Alma B. several times and received no answer. She left a voicemail stating that since she was waiting so long without a call back, a hotline call needed to be made. Robinson called the police because she had not seen the family and she was concerned that the children were home alone. The police knocked loudly with a flashlight. Alma B. opened the door. Robinson testified that Alma B. was upset that the police came and told Robinson that she would have to bring the police if she wanted to see her and the children in the home again. Robinson testified that the home and children were safe and appropriate. Alma B. told Robinson that she thought that her intact case had closed. Robinson told Alma B. that her case had not closed, explaining that, if the case had closed, then Alma B. would have received a letter stating that services were successfully completed.

¶ 12    On October 24, 2014, Robinson had a phone conversation with Alma B. regarding Alma B.'s noncompliance with home visits. Alma B. told Robinson that she did not know why she was considered noncompliant because she had done everything she could possibly do. Robinson then reminded Alma B. that she had not completed the parenting coaching program that Robinson recommended. She also reminded Alma B. that she had not agreed to give her Joshua's discharge papers and Alma B. said "no comment." On the same date, Alma B. informed

Robinson that she had moved in with a friend. Robinson told Alma B. that she needed to schedule a home visit to assess the home the children were living in. Alma B. indicated that she would call back with an address after she spoke with her friend to see if she could schedule an appointment. Two days later, Alma B. called Robinson and stated that she could not provide an address. Robinson never saw the children at that home and could not confirm that they were staying with that friend.

¶ 13    On October 22, 2014, Robinson spoke with her supervisor about this case because she had not seen the family for weeks and she was concerned. He supervisor indicated that she may have to screen the case into court. Robinson spoke to Alma B. on the phone on October 24, 2014. They agreed to meet at the library because Alma B. stated that they could not meet at her friend's house and refused to provide an address. They never met at the library because Alma B. learned that a new hotline call was made on October 27, 2014, and she refused to meet with Robinson. Robinson testified that, at the time that hotline call was made, the intact family case was still open.

¶ 14    Robinson testified that she observed Alma B.'s interactions with the children from March of 2014 through July of 2014 and that they were appropriate; that during this time, the children never stated that they felt unsafe in Alma B.'s care, nor did they show any signs of abuse or neglect; that they appeared well nourished, clean and appropriately dressed; and that she observed Alma B. redirecting Joshua when he would misbehave and she saw Alma B. engage with her children. Robinson testified that Isaiah was a little younger than 1 ½ old when she met him. Robinson stated that he was learning how to walk. Robinson testified that the interactions between Isaiah and his brothers were sometimes a bit rough. She asked Alma B. to supervise contact between the brothers because Joshua was "rough" to both of his siblings. Robinson

testified that Alma B. seemed receptive to supervising the contact and stated that Alma B. told her that the children were on a waitlist for three years to get into Walt Disney School and Alma B. was excited that the children were admitted.

¶ 15    Yvette Harris testified to the following facts.  She was an investigator employed with the DCFS.  She testified that a hotline report was filed on October 27, 2014, for allegations of burns caused by neglect for Isaiah and environmental neglect for the other minors.  On the same date, Harris spoke with Alma B. by telephone.  She informed Alma B. of the allegation, told her that she needed to see the minors and that Isaiah needed to be seen by a doctor.  Alma B. stated that she could not take Isaiah to the doctor at that time, but she would take him the next day.  Alma B. told Harris that Isaiah was with a friend in Waukegan but refused to provide any information about the friend. Alma B. stated that Joshua and Adam were also staying with a different set of friends but did not provide an address or any other information about them.  Alma B. provided Harris with the name "Betty."  Harris testified that Alma B. called the agency asking for transportation to Waukegan in order to pick up Isaiah.  Harris informed her that DCFS could not transport children if DCFS did not have custody of the children.

¶ 16    Alma B. told Harris that she received intact services and that she last saw her case worker on September 16, 2014.  Alma B. told Harris that she lived "friend to friend" because her home on South Kedvale Avenue was not safe because it was infested with rats. Alma B. also informed Harris that she had taken Isaiah to daycare because she had to work. She told Harris that she informed a daycare employee that there was a burn on Isaiah's leg.  The employee told Alma B. that she had to call DCFS.  Alma B. told Harris that she believed that the hotline call was made because she was homeless and not because of the burn.

¶ 17    Harris testified that Alma B. took Isaiah to Lurie's Children's Hospital (Lurie) on October 28, 2014.  Harris attempted to contact Alma B. to find out why she left the hospital against medical advice when Isaiah had not been cleared for the discharge.  Harris testified that Alma B. claimed that Isaiah received the second degree burn on his upper thigh from a space heater. Harris asked Alma B. to see the space heater in order to match the instrument that caused the burn to the pattern of the burn on Isaiah, but Alma B. did not allow Harris access to her home where she said that the burn occurred.   Harris testified that she had never seen the space heater that Alma B. claimed caused Isaiah's injury.

¶ 18    On October 31, 2014, Harris spoke with Alma B. on the phone.  Alma B. agreed that a private agency transporter drive the children to the doctor's office for physicals. Alma B. was scheduled to meet the driver at Walt Disney School.  When Harris tried to contact her, Alma B. attempted to cancel, stating that she could not reach the school by 1 p.m.  Harris offered to drive her and agreed to pick her up on Arlington Street where Alma B. indicated that it was convenient for her.  Harris arrived at the address at 12:15 p.m. and Alma B. was not there.  Harris rang all doorbells on Arlington Street because Alma B. did not indicate a specific address and attempted to call Alma B. several times.

¶ 19    At about 12:40 p.m. Harris saw Alma B. coming through the alley of the building on West Arlington Street.  By the time Harris saw Alma B., 25 minutes after their scheduled meeting, Harris' supervisor had already instructed her to take protective custody of the children. Alma B. stated that she was getting milk for Isaiah because he was hungry and stated that it was too cold outside to answer her phone.  Harris testified that she took protective custody of all three minors because of allegations of "burn by neglect," Alma B.'s refusal to let Harris enter the home, Alma B.'s refusal to engage in services, and the number of inconsistent explanations about

how Isaiah received his burn. Harris stated that she believed that the minors were at risk of harm.

¶ 20   The State entered several exhibits into evidence. The first exhibit was Isaiah's certified and delegated hospital records from Lurie. The medical records indicated that Isaiah was diagnosed with a second degree burn and with physical abuse of child. The medical records contained a photograph of a honeycomb pattern injury identified as a burn by the medical staff. The medical records also contained a photograph of Isaiah showing a red bump on his face below his eyes.

¶ 21   The medical notes indicated that Alma B. told the medical staff at Lurie that she brought Isaiah in because a bruise appeared on his thigh five days prior, and it was not getting better with Vaseline. The notes indicate that, later, Alma B. stated that she brought Isaiah to Lurie as soon as she noticed the bruise. The notes reflected that, during an interview with Lurie's social worker, Alma B. stated that she did not know how Isaiah got the bruise and refused to answer questions regarding her fiancé who was in the waiting room and whether she had other children outside of her care. The final diagnosis entered by Dr. Norell Rosado as indicated by the medical records was that Isaiah suffered from "physical abuse, blisters with epidermal loss caused by a second-degree burn." The notes indicate that Alma B. was confrontational, anxious and agitated. The social worker reported concerns for Isaiah's burn and for his environment. The medical staff recommended a skeletal survey due to concerns that Isaiah had abusive burns and some bruises but Alma B. left the emergency department before it was completed. DCFS and the police were contacted.

¶ 22   The second exhibit was Joshua's certified and delegated therapy records from C4. The records stated that during intake, Alma B. told the staff that Joshua was very aggressive at home

and that he had anxiety and crying spells. Several notes reflected that Joshua bit his older brother, breaking the skin and causing bleeding. The notes indicated that, as recounted by Alma B., Joshua hurt his brother Isaiah and Alma B. had to take him to the emergency room. Joshua was diagnosed with ADHD, Impulse Control Disorder, problems with primary support group, problems with social environment, and educational problems. On May 23, 2014, Joshua was psychiatrically hospitalized at Garfield Park Hospital. Joshua exhibited physical aggression, impulsivity, homicidal ideation, and audiovisual hallucination with command to hurt others.

¶ 23    Joshua reported that he "sees people (adults) with guns. Joshua also stated that he "wants to kill people" but cannot because he would "get suspended." The records indicate that on July 10, 2014, Alma B. was blaming the clinician for not following up with the family and the clinician explained to her that it was a parent driven process and reported that Alma B. did not appear to understand. According to the reports, Alma B. stated that she had no control over the two older boys who were not listening to her directives. She also reported that Joshua would sleep in her bedroom to protect the other children. The notes reflected that Joshua appeared to have experienced trauma such as emotional and physical abuse from a former paramour, but Alma B. did not give any details. Isaiah's diagnosis from C4 was ADHD. Joshua missed several appointments, and on August 12, 2014, the C4 case closed due to "noncompliance or lack of motivation."

¶ 24    The State admitted into evidence Alma B.'s certified and delegated parenting coach reports form Mary & Tom Leo. The reports indicate that Alma B. missed three scheduled sessions and the service was canceled to excessive absence and "to reduce Alma B.'s stress about this service."

¶ 25 The State also admitted into evidence Joshua's certified and delegated Garfield Park Hospital records. Joshua was admitted to Garfield Park Hospital on May 23, 2014, due to increasing aggression and to stabilize his behavior, and he was discharged on June 16, 2014. On admission, his diagnoses were ADHD and impulse control disorder, severely hyperactive and had "homicidal/violent/destructive threats, gestures or behaviors." The records indicate that Joshua was violent towards his brothers on multiple occasions. Records from May 25, 2015 state that:

> "[Joshua] has a long history of aggressive behavior at home and school. Prior to admission, the patient bit his 9-year-old brother when they began arguing. [Joshua] stated, "I don't know why I did it. My brain was acting up and told me to do it. [Joshua] has a history of acting out, hyperactivity and low frustration tolerance. He is argumentative, both at school and home. In the past, family members had to go the emergency room due to patient's aggression."

¶ 26 The reports reflect that he reported that he was afraid of sleeping alone, he saw people when the lights were out, and he heard voices telling him to hurt others. Joshua received IEP, received suspensions for fighting peers and left school one time. On a few occasions Joshua reported visual hallucinations in that he saw bugs and spiders. The notes contain an aftercare recommendation for Joshua to receive therapy and medication management from C4. The reports also indicate that Alma B. was reluctant to consent to Ritalin and refused to consent to Tennex. He was discharged and he was prescribed Tennex. A note listed "potential for lack of compliance with aftercare recommendations as a risk factor." The notes indicate that after the hospitalization, Alma B. did not follow-up with the psychotherapy recommendation and the C4 service was canceled.

¶ 27    On July 25, 2014, Joshua was readmitted to Garfield Park Hospital's pediatric day hospital due to increased aggression, and was discharged on August 19, 2014. The records indicate that he attacked Isaiah on multiple occasions and slammed his head against the wall. A report from Garfield Park Hospital dated July 28, 2014, states the following:

> "[P]er mother, [Joshua] has displayed an increase aggression (physical and verbal) over the last year. He attacked his one year old brother on multiple occasions, once slamming [Isaiah's] head against a wall. [Joshua] also displays impulsive/risky behavior such as destroying property, having tantrums, and struggling to follow simple directions."

¶ 28    Joshua's admission diagnosis was episodic mood disorder not otherwise specified and the medical staff recommended a partial day hospitalization for his aggression. Based on Joshua's psychological evaluation, he was recommended individual psychotherapy twice weekly. Joshua's medication was changed to Straterra. As noted in the reports, Joshua missed several days and the program staff had difficulty reaching Alma B. The reports also indicated that Joshua made minimal improvement and was ultimately discharged from the day program for nonattendance.

¶ 29    The State also admitted into evidence certified copies of Alma B.'s prior indicated abuse and neglect reports. The reports against Alma B. contained allegations for nonorganic failure to thrive (July 2, 2009), for inadequate supervision for Joshua (March 6, 2012), for inadequate supervision for all three children (June 4, 2012), and for inadequate shelter for Isaiah (August 6, 2013). The allegations in the reports were later determined to be unfounded.

¶ 30    After hearing and reviewing all of the evidence, the trial court found that all three children were neglected due to lack of care and to an injurious environment, and that they were

12

abused due to a substantial risk of physical injury. The trial court found that Alma B. perpetuated the abuse and neglect.

¶ 31    Subsequently, the trial court found that Alma B. was unable for some reason other than financial circumstances to care for, protect, or train her children. All three minors were adjudicated wards of the court and placed in the guardianship of DCFS. Given that Alma B. only appeals from the findings of abuse and neglect at the adjudication hearing, we need not discuss the evidence presented at the dispositional hearing. We do note, however, that after hearing the evidence presented at the dispositional hearing, the court adjudged the minors wards of the court and placed them in the custody and guardianship of the DCFS guardianship administrator.

¶ 32                                    ANALYSIS

¶ 33    On appeal, Alma B. argues that the trial court's findings of abuse and neglect for all three minors were against the manifest weight of the evidence. Alma B. contends that the trial court erroneously applied the doctrine of anticipatory neglect and that it improperly found that the minors were neglected based solely on "the tiny burn of Isaiah."

¶ 34    A "neglected minor" includes any minor under 18 years of age whose environment is injurious to his or her welfare. 705 ILCS 405/2-3(1)(b) (West 2004); *In re Arthur H.,* 212 Ill. 2d 441, 462 (2004). "Neglect is defined as the failure to exercise the care that circumstances justly demand and encompasses both willful and unintentional disregard of parental duty." *In re K.T.,* 361 Ill. App. 3d 187, 200 (2005). An injurious environment is an amorphous concept that cannot be defined with particularity, but has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his children. *Arthur H.*, 212 Ill. 2d at 463. Furthermore, a parent has a duty to keep his children free from harm. *In re A.R.*, 359 Ill. App. 3d 1071, 1074 (2005). An abused minor includes any minor under 18 years old whose parent creates a

substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function. 705 ILCS 405/2-3(2)(ii) (West 2004). Cases involving allegations of abuse, and neglect are *sui generis,* and must be decided on the basis of their unique facts. *Arthur H.*, 212 Ill. 2d at 463. The State has the burden of proving allegations of neglect and abuse by a preponderance of the evidence. *In re T.S-P.*, 362 Ill. App. 3d 243, 248 (2005).

¶ 35     On review, a trial court's finding of neglect or abuse will not be reversed unless it is against the manifest weight of the evidence. *Arthur H.*, 212 Ill. 2d at 464. A trial court's finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Id.*

¶ 36     In the instant case, the trial court's findings that the evidence showed that Joshua, Isaiah and Adam were abused and neglected and that their environment was injurious to their welfare and presented a substantial risk of injury were not against the manifest weight of the evidence. Alma B.'s failure to provide the necessary medical care for Isaiah's burn and for Joshua's mental health needs as well as her noncompliance with intact services constituted sufficient evidence that all minors were abused due to a substantial risk of physical injury and neglected due to an injurious environment.

¶ 37                              A. Joshua

¶ 38     The trial court did not err in its finding that Joshua was abused and neglected. The record on appeal reflects that Joshua's mental health was unstable and that Alma B.'s failure to follow-up with his mental health services created a substantial risk of injury for himself and for his siblings. A child who does not receive appropriate medical evaluations or care is neglected. *In re Stephen K.,* 373 Ill. App. 3d 7, 20 (2007); *In re Erin A.*, 2012 IL App (1st) 120050, ¶ 7. In the

instant case, the record indicates that Joshua was twice psychiatrically hospitalized for increased aggression. The record indicates that Alma B. did not follow-up with the recommendations and treatments for Joshua's mental needs. As a consequence, Joshua's aggression towards his siblings increased. Specifically, Joshua's first psychiatric hospitalization at Garfield Park Hospital was due to increased aggression and audio-visual hallucinations. Joshua bit his older brother, Adam, and attacked his little brother, Isaiah, slamming his head to the wall. These violent behaviors required that the siblings receive treatment in the emergency room. The medical notes also indicate that Joshua saw people with guns and heard voices telling him to hurt others.

¶ 39    Furthermore, the medical notes from Garfield Park Hospital reflect that during Joshua's hospitalization, the medical staff struggled to reach Alma B. or to obtain her consent for Joshua's medication. Following his hospitalization, Alma B. failed to ensure that Joshua was taking his medication and told the social worker that Joshua was not taking his medication because she had a difficult time getting him to take it. In addition, Alma B. failed to comply with the discharge plan recommendation that Joshua see a therapist through C4. Consequently, Joshua was readmitted to Garfield Park Hospital due to behavioral problems. Following his hospitalization, Joshua began a partial day program at Garfield Park Hospital for his ADHD, ODD and aggression. However, Alma B. failed to ensure that Joshua attended all of his therapy sessions and Joshua was ultimately discharged from the services for nonattendance. Therefore, Joshua's untreated medical health issues and Alma B.'s failure to follow-up with Joshua's mental health needs created a substantial risk of injury for Joshua and for his siblings.

¶ 40    Accordingly, based on the record, the trial court's finding that Joshua was neglected due to lack of care, neglected due to an injurious environment and abused due to substantial risk of

physical injury was not against the manifest weight of the evidence. See *In re Kenneth D.,* 364 Ill. App. 3d 797 (2006) (affirming the circuit court's findings of abuse due to a substantial risk of physical injury, and neglect due to an injurious environment, which were based on the same evidence); see also *In re R.G.,* 2012 IL App (1st) 120193, ¶ 46 (same evidence that supports the finding of abuse due to a substantial risk of physical injury, supports the finding that the State proved, by a preponderance of the evidence, that minor was neglected due to an injurious environment).

¶ 41                                                  B. Isaiah

¶ 42     The evidence regarding Isaiah's second degree burn and the delay in getting medical treatment supported the findings that he was abused due to substantial risk of physical injury, and neglected due to lack of care.  In *In re J.C.,* 2011 IL App (1st) 111374, ¶ 24, this court held that delaying in  seeking medical attention for a minor's injuries caused by a burn created a substantial risk of physical injury to him.  Similarly, in the instant case, Alma B. created a substantial risk of injury to Isaiah by failing to take him to the hospital promptly.  Instead, she took him to the hospital after a daycare worker indicated that they would call DCFS.  Then, Alma B. left the hospital with Isaiah and refused to allow the medical staff to complete Isaiah's evaluation even though the staff had already explained that a skeletal survey of Isaiah was necessary to evaluate him for other unrecognized and remote injuries.  Notably, Isaiah's medical records from Lurie indicate a final diagnosis of "physical abuse, blisters with epidermal loss caused by a second-degree burn."

¶ 43     Moreover, the record indicates that Alma B. was evasive and gave conflicting versions of how and when Isaiah's burn occurred.  Specifically, Alma B. told the DCFS investigator that Isaiah was burned on a space heater at the Kedvale address, but she did not allow the investigator

into that address to see the instrument that reportedly caused the burn. Later, during an interview with a Lurie social worker, she stated that she does not know how Isaiah's burn occurred. Additionally, she told the intake medical staff at Lurie that she brought Isaiah to Lurie as soon as she noticed the bruise. However, Alma B. told Lurie's social worker that she noticed the "bruise" five days prior and that she did not know how Isaiah got it. These actions raised the medical staff's suspicions for burns by neglect and DCFS and the police were contacted.

¶ 44    In addition, the record indicates that Alma B. could not protect Isaiah from Joshua's aggression when Joshua attacked Isaiah slamming his head against the wall, therefore, creating an injurious environment for Isaiah. Accordingly, Isaiah's inexplicable second degree burn, Alma B.'s failure to get Isaiah to the hospital promptly for treatment and her failure to adequately protect Isaiah from Joshua's aggression constituted evidence that Isaiah was subject to neglect due to an injurious environment, neglect due to lack of care, and abuse due to a substantial risk of physical injury. See *In re R.G.,* 2012 IL App (1st) 120193, ¶ 46. The trial court's decision that Isaiah was abused and neglected was not against the manifest weight of the evidence.

¶ 45                                  C. Adam

¶ 46    Alma B. argues that the trial court erred when it found that Adam was abused or neglected because there was no evidence of abuse or neglect presented regarding Adam and that the trial court erred by improperly applying the doctrine of anticipatory neglect.

¶ 47    Initially, we note that Adam, Joshua and Isaiah were all living in and experiencing conditions in the same home at the same time, and each of the minors, including Adam, who was bitten by Joshua, who was not provided with proper and consistent mental health care, had experienced actual harm. Joshua's untreated mental health issues and Alma B.'s failure to follow-up with the medical staff's recommendation for Joshua's mental health needs, created an

17

injurious environment for Adam who suffered a direct injury as a result of his brother's aggression. In addition, Alma B.'s noncompliance with the intact family services and the family visits adversely affected Adam and his siblings because the social workers could not assess the home's safety at all times. Accordingly, the trial court ruling that Adam was abused and neglected was not against the manifest weight of the evidence.

¶ 48    Moreover, to prove its allegations of abuse and neglect, the State was not required to show that each minor had already been harmed. Under the theory of anticipatory neglect, "the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside with an individual who has been found to have neglected or abused another child." *Arthur H.,* 212 Ill. 2d at 468. Although the neglect of one child does not conclusively show the neglect of another child, the neglect of one minor is admissible as evidence of the neglect of another minor under a parent's care. *T.S-P.*, 362 Ill. App. 3d at 248-49. Under this theory, when faced with evidence of prior neglect by parents, the juvenile court should not be forced to refrain from acting until another child is injured. *Arthur H.,* 212 Ill. 2d at 477.

¶ 49    Based on the record before us, we find that the court's finding that Adam was abused and neglected under the theory of anticipatory neglect was not against the manifest weight of the evidence. Alma B.'s failure to get immediate medical help for Isaiah's second degree burn and Alma B.'s failure to follow-up with the medical staff's recommendation for Joshua's mental health needs created as injurious environment for Adam. See *In Erin A.*, 2012 IL App (1st) 120050, ¶ 35 (holding that that Erin A.'s sibling was neglected because she lived in an injurious environment in which her sibling was not receiving proper medical care). The trial court's finding that it need not wait for something else to happen to Adam to find that he was abused and

18

neglected was justified. Therefore, the trial court's finding that Adam was abused and neglected was not against the manifest weight of the evidence.

¶ 50    Alma B. argues that this case is similar to *In re Edricka C.*, 276 Ill. App. 3d 18, 20 (1995), where this court reversed the trial court's neglect findings that were based on anticipatory neglect. In *Edricka C.*, the evidence presented indicated that the mother abused a daughter in 1987 and left several children unattended in 1989. *Id.* A new petition was filed in 1993. *Id.* The petition alleged that the mother's younger children, born after the incidents of neglect occurred, were at risk because of past incidents with older children. *Id.* This court found that under the circumstances of the case, "evidence of past sibling abuse is admissible, but, by itself, insufficient to show that abuse and neglect are imminent" for Edricka and her sibling because the record showed that Edricka had been in perfect health, the mother sought and completed counseling services, the DCFS employee testified that the minors were not at risk, and the mother had begun parenting classes. *Id.* at 29-30.

¶ 51    Alma B.'s reliance on *Edricka C.* is misplaced. Unlike *Edricka C.*, in the instant case, no minor was born after the alleged abuse and neglect occurred. The trial court found that all three children were neglected and abused concurrently when Alma B. created an unstable and injurious environment for the minors. Unlike *Edricka C.* where the mother sought and completed counseling services following the neglect findings in 1989, in the instant case, Alma B. was noncompliant with services. For instance, Mary & Tom Leo dropped Alma B. from parenting coaching due to excessive absences and to reduce Alma B.'s stress and not because it was in the children's best interest to end the service. Alma B. failed to ensure that Joshua received the proper counseling for his mental health needs and C4 terminated their services due to nonattendance. Similarly, due to excessive absences, Joshua was discharged from the partial

day program at Garfield Park Hospital, a service intended to address his ADHD, ODD and aggression.

¶ 52    Furthermore, Alma B. refused to allow the intact caseworker and the DCFS investigator to assess the safety of the homes where the children reportedly lived.  In fact, on September 16, 2014, the intact caseworker called the police because she was not sure if the children were home alone and had not seen the family in almost a month.  Alma B. also refused to disclose to the intact caseworker and the DCFS investigator her new addresses where the children were reportedly staying and she did not make the children available for Harris to transport them for their physicals.  Therefore, Alma B.'s noncompliance with recommended intact services, her refusal to allow the intact caseworker and the DCFS investigator to assess the safety of the homes where the children lived, and her failure to assist the DCFS investigator to procure medical care for the children constituted evidence of abuse and neglect for all the minors. See *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶¶ 41-44 (noting that mother's lack of participation and progress in services supported the trial court's abuse and neglect findings).

¶ 53    In sum, based on the entire record, the trial court's findings that Joshua, Isaiah and Adam were abused due to substantial risk of physical injury, neglected due to injurious environment, and neglected due to a lack of care were not against the manifest weight of the evidence.

¶ 54                                    CONCLUSION

¶ 55    Based on the foregoing, we affirm.

¶ 56    Affirmed.